| | |
|---|---|
| MARIA OLGA ZAVALA | CIVIL ACTION |
| VERSUS | NO. 17-656-JWD-EWD |
| CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE, *et al*. | |

## RULING AND ORDER

### I.     INTRODUCTION

Plaintiff Maria Olga Zavala filed this lawsuit on September 20, 2017, against a number of entities and individuals in connection with the death of her son at the East Baton Rouge Parish Prison in Baton Rouge, Louisiana.  Pending before the Court are motions to dismiss filed by Defendants Charles Bridges (Doc. 27); City of Baton Rouge/Parish of East Baton Rouge, Prison Medical Services, and Rintha Simpson (Doc. 34); CorrectHealth, LLC (Doc. 40); Sid J. Gautreaux, III, Dennis Grimes, and Nova Casualty Company (Doc. 47); and Robert Blanche (Doc. 61).

After careful consideration of the parties' submissions and the relevant law, and for the following reasons, the motions to dismiss filed by Defendants Charles Bridges (Doc. 27), Prison Medical Services (Doc. 34), Rintha Simpson (Doc. 34), and Robert Blanche (Doc. 61) are GRANTED; the motions to dismiss filed by CorrectHealth, LLC (Doc. 40), Sid J. Gautreaux, III, Dennis Grimes, and Nova Casualty Company (Doc. 47) are GRANTED in part and DENIED in part; and the motion to dismiss filed by City of Baton Rouge/Parish of East Baton Rouge (Doc. 34) is DENIED.

### II.     FACTUAL BACKGROUND

#### A.  Specific Events Underlying This Case

Zavala alleges that her son, Louis Fano, was a prisoner at East Baton Rouge Parish Prison ("EBRPP") in Baton Rouge, Louisiana, who suffered and died as a result of Defendants' failure to properly treat Fano's mental illness and ultimately prevent his death. (Doc. 23 at 1). Named as Defendants are: (1) the City of Baton Rouge and East Baton Rouge Parish (the "City/Parish"); (2) Sid Gautreaux, III, East Baton Rouge Parish Sheriff; (3) Dennis Grimes, EBRPP Warden; (4) Prison Medical Services, with which until December 31, 2016, the East Baton Rouge Parish Sheriff's Office ("Sheriff's Office") and City/Parish contracted to provide medical and mental health services to prisoners at EBRPP; (5) Rintha Simpson, the interim director of PMS until December 31, 2016; (6) Dr. Charles Bridges, the medical director of EBRPP; (7) Dr. Robert Blanche, a psychiatrist for EBRPP's mental health program; (8) CorrectHealth East Baton Rouge, LLC ("CorrectHealth"), with which the Sheriff's Office and City-Parish contracted as of January 1, 2017, to provide medical and mental health services to prisoners at EBRPP; and (9) Nova Casualty Company, a liability insurer for the Sheriff's Office. (*Id.* at 2–6).

Zavala's First Amended Complaint (Doc. 23) alleges the following facts. On October 31, 2016, Fano, who was traveling by bus from Miami, Florida, to California, was arrested by Baton Rouge police officers for several misdemeanors and booked into EBRPP. (*Id.* at 6–7). At the time of his arrest, Fano was "naked and running around and swinging his penis . . . hollering and cussing at imaginary people." (*Id.* at 7). He claimed that he and "Titianna," an imaginary person, were "cross dressers and trying to find a show to make money." (*Id.*). At one point, Fano lifted his shirt and began "twirling around hollering he was beautiful and there was no law against anything he and Titianna were doing." (*Id.*).

On November 1, 2016, Fano was placed in a dorm and within hours attempted suicide by cutting his wrists. (*Id.* at 9). An EBRPP corrections officer issued a disciplinary report for "self-

mutilation," and a disciplinary committee ultimately imposed 13 days of isolation. (*Id.*). Fano was later taken to the hospital. (*Id.*). On a November 1, 2016 emergency medical request form, a PMS staff member incorrectly noted that Fano had "no mental health history," but did note that he had a "suicidal cut to [left] wrist" and complained of "hearing voices." (*Id.* at 10).

The next day, Fano was placed on suicide watch in in a single-person cell, and PMS staff reported that he had a "depressed mood" and "bizarre thoughts or behavior." (*Id.*). An appointment with a social worker was made for "suicide precautions" and classified as "the highest level or priority," but the appointment was "never kept" and was deleted from the system on January 6, 2017, as an "overdue task prior to CorrectHealth Transition of health services." (*Id.* at 12).

On November 3, Dr. Blanche assessed Fano through the bars of his cell and "determined that [Fano] was 'not suicidal,'" discontinued the suicide watch, and prescribed Seroquel for sleep and olanzapine for Fano's bipolar disorder. (*Id.*). Dr. Blanche assessed inmates like Fano through cell bars "due to the difficulty of moving such patients" rather than for "any valid medical reason." (*Id.*). The next day, an appointment was made for Fano to see a psychiatrist for a one-month "return to clinic" visit on December 15, 2016; this appointment was also classified at the "highest level of priority" but never occurred. (*Id.* at 12). It appears that, the same day, another return-to-clinic appointment was scheduled for January 3, 2017. (*Id.* at 14). That appointment was also not kept and was classified as "rescheduled" with no new date noted. (*Id.*). "In the alternative, [Fano] was seen on January 3, 2017 by a medical staff person with [CorrectHealth]. The exam sheet noted that [Fano] complained of anxiety, problems with depression, and hearing voices. The unknown medical staff person prescribed hydroxyzine for anxiety." (*Id.*).

On November 25, 2016, Fano completed a medical request form, stating that his medications were no longer effective, that he had "a lot of anxiety," and that he could not sleep.

(*Id.* at 13).  Medical staff apparently made a psychiatric appointment for December 15, 2016, but no record exists that Fano saw any psychiatrist on that date. (*Id.*).  A few weeks later, on December 18, Fano completed a medical request form stating that he was having "really bad anxiety and depression" and "really bad thoughts of [his] time here." (*Id.*).  The "medical staff disposition" was "seen on 1/3/17." (*Id.*).

On December 22, 2016, a sick-call appointment was made for Fano to see an unspecified medical or mental health staffer concerning "[a]nxiety; [d]epression" on the same day. (*Id.*).  This appointment never occurred. (*Id.*).  A second sick-call appointment was made concerning the same issue for the next day, and it was also never kept (and later deleted from the system as an overdue task). (*Id.* at 13–14).  On December 26, another sick-call appointment was made, with the note "NEED TO SEE PSYCH." (*Id.* at 14).  The appointment was completed, but Dr. Blanche made no notes concerning the appointment in Fano's file.  (*Id.*).

On January 11, 2017, Fano was seen on a mental health sick call by a CorrectHealth staffer due to a report that he was not taking medication or eating. (*Id.*).  Fano was referred to Dr. Blanche and prescribed hydroxyzine for anxiety. (*Id.*).  The same day, Fano was seen by a CorrectHealth staffer who reported suspicions that Fano was "faking bad or exaggerating his condition" and wrote that he "present[ed] as stable overall." (*Id.* at 15).  On January 18 or 19,[1] Dr. Blanche assessed Fano through the bars of his cell, noting that he doubted "serious mental illness" and that he would begin reducing Fano's medications. (*Id.*).  Dr. Blanche ordered that Fano's Zyprexa be reduced immediately and discontinued after a week. (*Id.*).

On February 2, 2017, Fano was found hanging from the bars of his cell and was transported to the hospital in critical condition. (*Id.*).  He was declared dead three days later. (*Id.*).

---

[1] The First Amended Complaint states that this occurred in 2016, but it is clear that this is a typographical error based on the timeline in the amended complaint.

In interviews conducted after Fano's death, two prisoners reported that Fano was "crying often," which no staffer had documented. (*Id.*). An officer also found two notes in Fano's cell indicating that he had been targeted by other prisoners for "his food and sex."[2] (*Id.* at 16).

While Fano was at EBRPP, family members visited once and called two or three times per week. (*Id.*). Family members informed EBRPP staff members of Fano's mental health issues and "begged" them for treatment, and they were told that Fano was receiving the medication and treatment he needed. (*Id.*).

Fano spent nearly all of his time at EBRPP in solitary confinement. (*Id.*). Between November 2 and December 16, 2016, Fano received an average of 11 minutes per day out of his cell. (*Id.*). Between November 5, 2016, and February 1, 2017, Fano "refused," was "not present" for, or did not receive his medication due to "other" reasons 57 times. (*Id.* at 17). "Documentation why occurred only 6 times." (*Id.*).

### B. HMA Report and Allegations of Policies, Practices, and Conditions

In January 2016, the City/Parish contracted with Health Management Associates ("HMA") to assess clinical operations and medical services at EBRPP. (*Id.* at 7). HMA interviewed various individuals, including Simpson, Grimes, Dr. Blanche, and Dr. Bridges, in connection with the assessment. (*Id.*). A site visit occurred in February 2016, and findings and recommendations were presented publicly in June 2016. (*Id.*). Drafts of HMA's report were presented to Simpson, Grimes, Dr. Blanche, and Dr. Bridges, as well as members of the City/Parish's Metrso Council. (*Id.* at 8).

The HMA report allegedly established the following facts. Prisoners brought to EBRPP and "appearing ill" are taken to a hospital for evaluation. (*Id.*). Ten percent of newly admitted

---

[2] While the amended complaint does not specify, the Court presumes that these notes were written by Fano himself.

prisoners do not receive an intake screening "on a timely basis," and some never do. (*Id.*).

Additionally, nurses who perform the screenings vary in their "adherence to screening policy and

procedures." (*Id.*). Further, chart reviews "showed no evidence of [EBRPP] health staff following

up upon return [from the local hospital] other than noting inmate was back at" EBRPP. (*Id.* at 9).

Prisoners on suicide watch are placed in single person cells with no recreation or personal

visits and are locked in their cells for at least 23 and a half hours per day. (*Id.* at 10). There is no

"mental health housing unit" at EBRPP, and HMA characterized the unit where suicide-watch

cells are located as "woefully inadequate," as it is loud and without group rooms, a dayroom, or a

private interview area. (*Id.*). HMA also opined that mental health staffing is inadequate to address

the needs of mentally ill inmates, the cells housing mentally ill inmates contain suicide risks, and

there is no mental health programming at ERBPP due to inadequate staffing and facilities. (*Id.* at

11).

The report concluded that the medication delivery system at EBRPP had a "missed

med[ication] passage" rate of 22 percent, which is high compared to other jails. (*Id.* at 16).

Additionally, staffers fail to document why prisoners are "not present" for their medication

delivery. (*Id.*).

According to the report, EBRPP is understaffed and underfunded. (*Id.* at 17–18). Licensed

practical nurses provide "the majority of care" at EBRPP, meaning that "so much of what needs

to be done is out of their scope of practice." (*Id.*). Additionally, ERBPP's infirmary rooms are

"infirmaries in name only," as they are out of sight of EBRPP personnel and without hospital beds.

(*Id.* at 18). Inmates must generally request a form from an officer to request health services and

are sometimes required to make multiple requests for healthcare forms. (*Id.*). The unit where Fano

was housed and others like it are "frequently loud with inmates who are shaking bars, throwing

feces etc." (*Id.*).  Blanche has not provided "suicide training" to health care staff in over a year and has not provided such training to correctional officers in a number of years. (*Id.* at 18–19).  Mental health staffing is inadequate to address the needs of EBRPP's mental health caseload, and the provision of healthcare at EBRPP is "episodic and inconsistent." (*Id.* at 20).

As a result of these findings, HMA recommended that the budget for the medical, mental health, and dental care program at EBRPP be doubled. (*Id.* at 17).  However, the new contract between the City/Parish, the Sheriff's Office, and CorrectHealth increased the budget "less than 6%." (*Id.*).  Zavala further alleges that, despite U.S. Department of Justice data showing that the mortality rate at EBRPP has been higher than the national average for several years, EBRPP does not prepare mortality reports for prisoner deaths at EBRPP and has no mortality committee. (*Id.* at 19–20).  EBRPP's mental health program has no quality improvement committee nor are any "mental health quality metrics" measured, tracked, or monitored. (*Id.* at 20).  Zavala also contends that Gautreaux and Grimes have a policy of delegating all health care responsibilities to HMA and CorrectHealth. (*Id.*).

Zavala points to "other systemic failures at EBRPP" as well. (*Id.* at 21).  She claims that, due to its physical design, inadequate staffing and supervision, and other factors, larger and stronger inmates at EBRPP are able to prey on smaller and more docile prisoners like Fano. (*Id.*).  Zavala claims that the overuse of solitary confinement, the failure of EBRPP staff to monitor living areas, and the failure of staff to intervene to protect prisoners from threats are the result of explicit and *de facto* policies so pervasive that Gautreaux and Grimes "should have known of them." (*Id.*).  Gautreaux and Grimes have instituted a policy employing solitary confinement as punishment and a "warehouse" for prisoners with serious mental illness which, according to Zavala, is not related to a legitimate government objective. (*Id.*).  And there is no consistent monitoring or rating system

at EBRPP to standardize the delivery of mental healthcare to prisoners on suicide watch. (*Id.*). As a result of these alleged policies, EBRPP staff members "falsely document" completing their rounds. (*Id.* at 22).

Zavala further asserts that: (1) since 2013, at least four people died at EBRPP due to inadequate medical care; (2) in February 2015, Grimes publicly acknowledged that cell doors at EBRPP do not shut due to rust, the layout of the prison makes it difficult to monitor prisoners, and overpopulation requires sending hundreds of prisoners to other parishes; (3) in May 2015, Lamar Johnson entered EBRPP after being detained during a routine traffic stop, and he attempted suicide four days later; (4) in October 2015, an unspecified "Baton Rouge elected official" complained about a study of the medical care at EBRPP, noting that the Metro Council "already knows about numerous problems" with EBRPP's healthcare system; (5) also in October 2015, Gautreaux was reported to have requested a new jail "for years" and that officials "long ago identified the problem: a dilapidated facility that is ill-equipped to hold . . . mentally ill who are booked"; and (6) in February 2016, 17-year-old Tyrin Colbert died at the hands of his cellmate, and Gautreaux's spokesperson acknowledged that the death proved that EBRPP is unsafe. (*Id.* at 24–25).

Zavala asserts 14 causes of action. (*Id.* at 26–37). Count One is a 42 U.S.C. § 1983 claim alleging the "establishment of a system in which prisoners with serious health issues are denied access to appropriate medical care." (*Id.* at 26–27). Count One is brought against the City/Parish, PMS, CorrectHealth, Gautreaux, Simpson, Dr. Bridges, and Dr. Blanche, with the individual Defendants sued in their official capacities only. (*Id.* at 26).

Count Two is a § 1983 municipal-liability claim alleging the "establishment of policies, patterns, or practices pursuant to which prisoners with serious mental health conditions are denied access to appropriate medical care." (*Id.* at 27–28). Count Two is brought against the City/Parish,

PMS, CorrectHealth, Gautreaux, and Simpson, with all individuals sued in their official capacities. (*Id.* at 27).

Count Three is a § 1983 claim "based on the de facto policy, as evidenced by extended, pervasive misconduct by EBRPP staff, that create conditions and treatment [sic] that constitutes impermissible punishment of prisoners under the Due Process Clause." (*Id.* at 28–29). Count Three is brought against the City/Parish, Gautreaux, and Grimes in their official capacities. (*Id.* at 28).

Count Four is a § 1983 municipal-liability claim "based on unconstitutional conditions of confinement that constitutes impermissible punishment of prisoners under the Due Process Clause." (*Id.* at 29–31). Count Four is asserted against the City/Parish, Gautreaux, and Grimes in their official capacities. (*Id.* at 29).

Count Five is a § 1983 claim against Gautreaux and Grimes in their individual and official capacities for failure to supervise their subordinates to ensure appropriate medical care. (*Id.* at 31).

Count Six is a § 1983 claim for "deliberate indifference to [Fano's] constitutional right to appropriate medical and mental health care." (*Id.* at 32–33). Count Six is brought against CorrectHealth, Gautreaux, Grimes, Simpson, Dr. Bridges, and Dr. Blanche, with all natural persons sued in both their individual and official capacities. (*Id.* at 32).

Count Seven is a § 1983 claim against Dr. Blanche in his individual capacity only for providing "grossly inadequate medical care" and failing to properly diagnose and treat Fano's mental illness. (*Id.* at 33–34).

Count Eight is a state-law claim against Dr. Bridges and Dr. Blanche in their individual capacities only for intentional or negligent conduct that resulted in Fano's death. (*Id.* at 34). Count Nine is a state-law claim for vicarious liability against Gautreaux for the actions of his

subordinates. (*Id.* at 34–35). Counts Ten, Eleven, and Twelve are state-law claims for loss of consortium, wrongful death, and survival. (*Id.* at 35–36). Count Thirteen is a direct-action insurance claim against Nova. (*Id.* at 36). Finally, Count Fourteen is a state-law claim against Gautreaux for "breach of duty to provide medical treatment." (*Id.* at 36–37).

Zavala seeks compensatory damages from all Defendants and punitive damages from those Defendants sued in their individual capacities. (*Id.* at 25).

## III. STANDARD OF REVIEW

In *Johnson v. City of Shelby, Mississippi,* the Supreme Court explained that "[f]ederal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,'; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a), the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)]; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand, supra,* nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of

the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand,* 565 F.3d at 257; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.,* 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (quoting *Barber v. Bristol-Myers Squibb,* Civil Action No. 09-1562 (W.D. La. 2010)).

More recently, in *Thompson v. City of Waco, Texas,* 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit summarized the standard for a Rule 12(b)(6) motion:

We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. . . . To survive dismissal, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff state a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (citations and internal quotations omitted).

IV.    **DISCUSSION**

A.  **Parties' Arguments**

a.   **Motion to Dismiss by Dr. Bridges**

Dr. Bridges moves to dismiss all claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 27-1 at 1).  First, he argues that Zavala has failed to point to any "document or contract" permitting him to make "final clinical judgments concerning treatment of prisoners" or other policymaking and supervisory decisions as alleged. (*Id.* at 4–5).  Dr. Bridges also contends that Zavala's claims are premature because they have not been evaluated by a medical review panel as required by the Louisiana Medical Malpractice Act. (*Id.* at 6–8).  Next, he asserts that he is entitled to qualified immunity, noting that Zavala does not identify treatments

of which Fano was deprived or how that deprivation caused Fano's death, and that Zavala does not show that Bridges acted with the deliberate indifference required. (*Id.* at 9–13). Dr. Bridges also argues that Zavala did not allege the scope of his alleged failure to train or supervise, and asserts that Zavala's official-capacity claims do not allege a "persistent, widespread practice" that can be said to constitute a policy. (*Id.* at 12–15). Finally, Dr. Bridges requests that the Court decline to exercise jurisdiction over Zavala's state-law claims. (*Id.* at 15).

Zavala agrees to dismiss all state-law claims against Dr. Bridges. (Doc. 43 at 10; *see also* Doc. 58). She otherwise opposes Dr. Bridges' motion, arguing first that according to exhibits attached to her opposition brief, Dr. Bridges was "the medical director and health care policymaker at EBRPP." (Doc. 43 at 9–10; Docs. 43-1 & 43-2). Next, she argues that the Louisiana Medical Malpractice Act, which applies to unintentional conduct, is inapplicable to her claims because she alleges intentional or deliberately indifferent conduct. (Doc. 43 at 10–11). Otherwise, Zavala generally argues that her allegations that Dr. Bridges approved of or disregarded rights-violating conduct, or implementation of policies and practices violating the Constitution, are sufficient to state a claim. (*Id.* at 11–14).

### b. Motion to Dismiss by the City/Parish, PMS, and Simpson

First, PMS asserts that it is not an entity amenable to suit under § 1983. (*Id.* at 5). Next, the motion claims that "nowhere does [Zavala] identify the specific policy or procedure or pattern to which [Zavala] refers" in Counts One and Two. (*Id.* at 5–6). The motion argues that Zavala does not "attempt to distinguish" which policies or practices are attributable to which Defendant or state which policy constitutes the "moving force" behind the conduct complained of. (*Id.* at 6–7).

Simpson argues that she is entitled to qualified immunity with respect to the individual-capacity claims against her, that she left PMS almost six months before Fano became incarcerated, and that there are no allegations that she played a first-hand role in patient treatment or that she knew of Fano's complaints or the treatment that he was receiving. (*Id.* at 7–9 & 12).

With respect to Zavala's § 1983 claims against the City/Parish (including Zavala's claims against PMS and official capacity-claims against Simpson), the motion contends that Zavala fails to allege a "persistent, widespread practice of city official[s] or employees which is so common and well settled as to constitute a custom that fairly represents municipal policy." (*Id.* at 9–10).

With respect to Counts Three and Four, the motion claims that the City/Parish is "in no way" responsible for the housing, incarceration, or confinement of inmates at EBRPP. (*Id.* at 11). That is, the City/Parish pays for EBRPP's maintenance, but is uninvolved in its operations, which is the bailiwick of the Sheriff. (*Id.*). Finally, the motion requests that the Court decline to exercise jurisdiction over Zavala's state-law claims. (*Id.* at 13).

Zavala accedes to the dismissal of all claims against PMS. (Doc. 48 at 1 n.3). Zavala otherwise opposes and first argues that, under state law, parishes are obligated to provide constitutionally adequate healthcare for detainees at parish jails. (*Id.* at 9). Moreover, argues Zavala, municipalities may be liable under § 1983 for "systematic maladministration" and breaching duties under state and local law. (*Id.* at 9–10). Zavala insists that she adequately alleged that the City/Parish's inadequate funding and oversight of EBRPP caused many of the policies and practices challenged in this case. (*Id.* at 10 & 13–14). Additionally, Zavala alleges that Simpson approved of or disregarded rights-violating conduct, thereby giving rise to a claim for failure to supervise and train. (*Id.* at 11–14).

### c. Motion to Dismiss by CorrectHealth

CorrectHealth first argues that all of Zavala's allegations concerning the existence of a policy or practice predate its contract to provide healthcare services at EBRPP. (Doc. 40-1 at 7–9). CorrectHealth also argues that Zavala has not stated a deliberate indifference claim for conduct occurring after CorrectHealth began providing health services, as Fano actually received medical care during this time. (*Id.* at 9–11). It argues that, at most, Zavala has alleged negligence in the provision of medical care and failure to predict Fano's suicide, and this is insufficient to support a deliberate indifference claim. (*Id.* at 11–13). CorrectHealth also claims that Zavala's state-law claims are premature because they have not been reviewed by a medical panel. (*Id.* at 13–14).

In opposition, Zavala alleges that CorrectHealth "had to have known that EBRPP's health care system was perfectly designed to deliver . . . unconstitutional medical and mental health care to EBRPP's prisoners, including [Fano], and did nothing to change it." (Doc. 51 at 4, 9–10 & 12). For example, argues Zavala, Dr. Blanche's policy of evaluating detainees through cell bars continued after CorrectHealth took over. (*Id.* at 10). Zavala also argues that CorrectHealth continued to permit suicide hazards to exist in Fano's cell and continued to deprive inmates of adequate staffing and programming. (*Id.* at 10–11). She further contends that she has stated a viable deliberate indifference claim and does not merely disagree with the care that Fano received. (*Id.* at 11–12). Finally, Zavala argues that the Louisiana Medical Malpractice Act does not apply to her claims alleging intentional conduct or deliberate indifference. (*Id.* at 13).

### d. Motion to Dismiss by Gautreaux, Grimes, and Nova

Gautreaux, Grimes, and Nova move to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 47 at 1). With respect to Zavala's individual-capacity claims in Count Six, the motion claims that Gautreaux and Grimes are entitled to qualified

immunity. (Doc. 47-1 at 5–7). According to the motion, Zavala alleges no "personal involvement" by Gautreaux or Grimes in providing medical care to Fano, nor does she allege that they knew that he was a suicide risk or was receiving inadequate treatment. (*Id.* at 7–9). The motion also claims that any duty to intervene was not well established under applicable law and that Zavala has acknowledged that other Defendants were final policymakers regarding Fano's medical care. (*Id.* at 8–9).

Next, the motion argues that Zavala fails to state a supervisory liability claim. (*Id.* at 9–14). In particular, it faults Zavala for failing to identify who Gautreaux and Grimes failed to supervise, especially as Zavala has not named any deputy sheriffs as additional Defendants and, again, other Defendants were responsible for providing Fano's medical care. (*Id.* at 9–12). The motion claims that the amended complaint alleges "deficient policies or customs" but fails to explain in non-conclusory terms how a failure to train or supervise is related to these alleged policies. (*Id.* at 13–14).

The motion also argues that Zavala's failure to protect and deliberate indifference claims against Gautreaux and Grimes in their official capacity, functionally a claim against the Sheriff's Office, fail. (*Id.* at 14). The motion contends that Zavala's claims should be analyzed as episodic-acts-or-omissions claims for which deliberate indifference is required and that Zavala has not alleged deliberate indifference by any employee of the Sheriff's Office. (*Id.* at 17–22). Alternatively, even if Zavala's claims are cognizable under a conditions-of-confinement theory, the motion argues that they fail for inadequately alleging a policy. (*Id.* at 22–27). The motion also asserts that several of Zavala's allegations are of "questionable relevance" to her underlying claims concerning Fano's death. (*Id.* at 24–26). The motion reiterates that Zavala alleges that other Defendants were primarily responsible for medical care at EBRPP. (*Id.* at 26–27). Finally, the

motion also contends that punitive damages are not available against government entities under § 1983 and that Zavala has failed to allege unconstitutional conduct by sheriff deputies giving rise to vicarious liability against Gautreaux under state law. (*Id.* at 27–28).

In opposition, Zavala argues that Gautreaux and Grimes are liable in their individual capacity, "even though perhaps not personally involved in the constitutional violations," for developing and implementing unconstitutional policies and for failing to train officers involved. (Doc. 59 at 10–12). Zavala argues that her official-capacity claims also survive because she has alleged that Gautreaux and Grimes are policymakers, that several of their policies and practices combined to create an unconstitutional healthcare system at EBRPP, and that these policies and practices were the "moving force" behind Fano's suffering and death. (*Id.* at 13). Finally, because Zavala's federal claims survive, she argues that her state claims survive as well. (*Id.* at 14). She acknowledges, however, that Gautreaux and Grimes' exposure to punitive damages is limited to their federal individual-capacity claims. (*Id.* at 10 n.43).

### e. Motion to Dismiss by Dr. Blanche

Dr. Blanche argues that Zavala's state-law claims are premature because they have not been reviewed by a medical panel. (Doc. 61-1 at 2–5). Dr. Blanche also asserts that he is not a state actor subject to liability under § 1983 and, in the alternative, he is entitled to qualified immunity, as Zavala has failed to adequately allege his deliberate indifference to Fano's medical needs. (*Id.* at 5–6 & 8). On the contrary, Dr. Blanche argues that he evaluated and treated Fano and prescribed him appropriate medications. (*Id.* at 8–9).

In her opposition, Zavala contends that she has dismissed all state law claims against Dr. Blanche, and the remaining federal claims allege intentional or deliberately indifferent conduct outside the purview of the Louisiana Medical Malpractice Act. (Doc. 67 at 6). Next, Zavala claims

that, even acting as an "independent contractor," Dr. Blanche was a state actor providing medical care in a prison. (*Id.* at 9–10). Otherwise, Zavala asserts that Dr. Blanche personally evaluated Fano and failed to provide for his medical needs, failed to train and supervise EBRPP and healthcare staff, and made final clinical judgments about prisoner care and other healthcare policies and practices. (*Id.* at 11–12).

### B. Relevant Law

#### a. General Constitutional Standards

In evaluating constitutional claims by pretrial detainees, courts in the Fifth Circuit distinguish between challenges to general conditions, practices, rules, or restrictions of confinement and challenges to episodic acts and omissions by jail officials. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996). Plaintiffs may plead both theories in the alternative. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 n.1 (5th Cir. 2009).

In conditions-of-confinement cases, the "reasonable relationship test of *Bell v. Wolfish* is apposite." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (citation omitted). In such cases, the court assumes "by the municipality's very promulgation and maintenance of the complained-of condition that it intended to cause the alleged constitutional deprivation" *Id.* "Under *Wolfish*, a constitutional violation exists only if we then find that the condition of confinement is not reasonably related to a legitimate, non-punitive governmental objective." *Id.* (citation omitted). A condition of confinement is "usually the manifestation of an explicit policy or restriction," although a condition may also reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [officials], to prove an intended condition or practice." *Shepherd*, 591 F.3d at 452. Proving a pattern is a "heavy burden" that is rarely carried. *Id.* The Fifth Circuit has suggested

that conditions-of-confinement claims are cognizable against individual actors only in their official

capacities. *Nagle v. Gusman*, 2016 WL 768588, at *5 (E.D. La. Feb. 26, 2016).

With respect to episodic-acts-or-omissions claims, this Court provided the relevant

standard in *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717 (M.D. La. 2016):

> "[W]here the complained-of harm is a particular act or omission of one or more
> officials, the action is characterized properly as an episodic act or omission case."
> *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (internal quotation marks omitted).
> The relevant question now "becomes whether that official breached his
> constitutional duty to tend to the basic human needs of persons in his charge, and
> intentionality is no longer presumed." [*Reed v. Wichita Cnty*, 795 F.3d 456, 463
> (5th Cir. 2015)] (internal quotation marks omitted) (citing *Hare*, 74 F.3d at 645).
> For such a violation to be found, the official must have "subjective knowledge of a
> substantial risk of serious harm to the detainee and responded to that risk with
> deliberate indifference." *Hare*, 74 F.3d at 650. Generally, "[d]eliberate indifference
> is shown when the official knows of and disregards an excessive risk to inmate
> health or safety," and "the official must both be aware of facts from which the
> inference could be drawn that a substantial risk of serious harm exists, and he must
> also draw the inference." [*Estate of Henson v. Krajca*, 440 F. App'x 341, 343 (5th
> Cir. 2011)]. . . . [D]eliberate indifference . . . exist[s] "where a plaintiff shows that
> officials refused to treat him, ignored his complaints, intentionally treated him
> incorrectly, or engaged in any similar conduct that would clearly evince a wanton
> disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238
> (5th Cir. 1985) (internal quotation marks omitted).

*Id.* at 734–35. This Fourteenth Amendment standard for pretrial detainees mirrors the test for

episodic-acts-or-omissions claims by inmates under the Eighth Amendment. *See id.* at 734 n. 11;

*see also Thomas v. Mills*, 614 F. App'x 777, 778 (5th Cir. 2015). Contrary to Zavala's suggestion,

the standard applicable to pretrial detainees is a subjective standard rather than an objective one.

*See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017) (declining

to reconsider applicability of subjective standard). However, an official's subjective intent may

be demonstrated via inference from circumstantial evidence, and a factfinder may conclude that

an official knew of a substantial risk "from the very fact that the risk was obvious." *Hinojosa v.

Livingston*, 807 F.3d 657, 665 (5th Cir. 2015). And importantly, negligent inaction or "mere

oversight" does not violate a detainee's due process rights. *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000). To be deliberately indifferent to a known suicide risk, a plaintiff must establish that the officer was aware of a "substantial and significant risk" that a detainee might kill himself but "effectively disregarded it." *Id.*

### b. Qualified Immunity

"A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation." *Hinojosa*, 807 F.3d at 669 (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)). An official's conduct violates clearly established law where, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). However, "[a]n official that violates a constitutional right is still entitled to qualified immunity if his or her actions were objectively reasonable." *Perniciaro v. Lea*, – F.3d –, 2018 WL 3941607, at *7 (5th Cir. Aug. 16, 2018).

Importantly, the dispositive question in any qualified-immunity inquiry is "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). Thus, "general propositions of law defined at high levels of generality are insufficient to define clearly established law for purposes of defeating qualified immunity." *Perniciaro*, 2018 WL 3941607, at *8 (internal quotation marks omitted). Where a plaintiff fails to establish that the particular conduct at issue specifically violates clearly established law, qualified immunity will stand. *See id.* (finding qualified immunity where the plaintiff failed to cite "a single case—either in his briefing before the district court or [the appeals

court]—clearly establishing that the particular conduct at issue violates the [applicable legal standard]").

A qualified-immunity analysis is usually "a fact-intensive inquiry" that courts are reluctant to decide on the papers alone. *See, e.g., Dorsett-Felicelli v. Cnty. of Clinton,* 371 F. Supp. 2d 183, 193–94 (N.D.N.Y. 2005); *Sales v. Barizone*, 2004 WL 2781752, at *16 (S.D.N.Y. Dec. 2, 2004).

### c. Supervisor Liability and Failure to Train or Supervise

A supervisory official may be held liable under § 1983 "only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter*, 659 F.3d at 446 (quoting *Gates v. Texas Dep't of Prot. & Reg. Servs.,* 537 F.3d 404, 435 (5th Cir. 2008)). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Gates*, 537 F.3d at 435).

"A supervisor may also be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Porter*, 659 F.3d at 446 (quoting *Goodman v. Harris Cnty.,* 571 F.3d 388, 395 (5th Cir. 2009)). "[P]roof of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights." *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008) (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003)).

In the context of failure-to-supervise claims, the Fifth Circuit has said: "'for a supervisor to be liable . . . , the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Goodman*, 571 F.3d at 395 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir.2005)). "Moreover, 'for liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'" *Id.* (quoting *Roberts*, 397 F.3d at 293) (dismissing failure to supervise and failure to train claims together); *see also Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (to satisfy deliberate indifference element of failure-to-train claim, a plaintiff must usually demonstrate a "pattern of violations" and that inadequate training is "obvious and obviously likely to result in a constitutional violation"); *Floyd v. City of Kenner*, 351 F. App'x 890, 898 (5th Cir. 2009) ("[T]he pleadings must have sufficient precision and factual detail to reveal that more than guesswork is behind the allegation.").

### d. Municipal Liability Under *Monell*

"Although municipalities cannot be held liable under section 1983 by virtue of the doctrine of respondeat superior, they are subject to such liability where official custom or policy is involved in the injury." *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir. 1985) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985)). This principle was first recognized in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

"Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). The definition of "policy" includes:

A persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Pineda*, 291 F.3d at 328. A policy sufficient to satisfy *Monell* can be found where there is "systemic maladministration of the laws," *O'Quinn*, 733 F.2d at 608, although *Monell* liability presupposes a "conscious adoption of a course of action" and requires a practice that is "so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Cleveland*, 198 F. Supp. 3d at 735.

Whether an official has been delegated policymaking authority is a question of law for the judge. *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 617 (5th Cir. 1999). In making this determination, a court should consider state and local "positive law" as well as evidence of municipal "customs and usages." *See id.* at 616; *see also id.* at 616 n.2 (observing that the Supreme Court has rejected the principle of a "de facto" policymaker, but also determining that continuous refusal of actual policymaker to review decisions of subordinate official would, "at some point," establish the subordinate official as the policymaking authority via custom or usage).

"Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Piotrowski*, 237 F.3d at 579 (quoting *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984)). Elaborating on these requirements, the Fifth Circuit has stated:

Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808–09 (5th Cir. 2017) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)).

Finally, "[t]o succeed [in alleging 'moving force' causation], 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'" *Id.* (quoting *Brown*, 520 U.S. at 411).

### C. Analysis

For the following reasons, the Court will dismiss the § 1983 claim in Count Six without prejudice for Zavala's failure to allege acts or omissions by any individual Defendant that meet the legal standard for deliberate indifference with regard to Fano's medical treatment. However, the Court concludes that Zavala has stated sufficient facts to support liability under a conditions-of-confinement theory.

#### a. Dr. Bridges

Count One is a § 1983 claim alleging the establishment of a system in which prisoners are denied access to appropriate medical care. (Doc. 23 at 26). Count Six is a § 1983 claim asserting deliberate indifference to Fano's right to appropriate medical and mental health care. (*Id.* at 32). In Count One, Dr. Bridges is named in his official capacity as the "designated medical director" at EBRPP. (*Id.* at 4–5, 26). In Count Six, he is named in both his individual and official capacities. (*Id.* at 32).

Dr. Bridges contends that he is not a state actor because Zavala failed to "allege or cite any document or contract" that "gave [healthcare policymaking] powers to [Dr. Bridges]." (Doc. 27-1 at 4). However, as set forth previously, Rule 12(b)(6) does not sanction dismissal of a complaint for an "imperfect statement" of the legal theory undergirding it, *Johnson*, 135 S. Ct. at 346–47, and a complaint need only raise a reasonable hope or expectation that discovery will reveal relevant evidence of each element of a claim. *Lormand*, 565 F.3d at 257. Thus, there is no reason why, at the motion-to-dismiss stage, Zavala must provide evidence of such a "document or contract." Rather, the allegation that Dr. Bridges was a final policymaker with respect to medical care at EBRPP is sufficient. *See Colbert. v. City of Baton Rouge*, 2018 WL 2224062, at *4 n.6 & *5 (M.D. La. May 15, 2018) (plaintiff adequately alleged that Dr. Bridges was a state actor and final policymaker for § 1983 claim).

Moreover, under § 1983, "[t]o act under color of law does not require that the accused be an officer of the state." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (citation and internal quotation marks omitted). Indeed, private entities are state actors when performing "a function which is traditionally the exclusive province of the state." *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989). And the Supreme Court has specifically held that contract physicians, even those privately-employed, can be held liable under § 1983. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 55–56 (1988) ("The fact that the State employed respondent pursuant to a contractual arrangement . . . does not alter the analysis. It is the physician's function within the state system, not the precise terms of his employment that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner."). To conclude otherwise would in effect exempt a state contracting out prison healthcare from "its constitutional duty to provide

adequate medical treatment to those in its custody." *Id.* at 56. Here, Zavala alleged that Dr. Bridges and the other private actors (Dr. Blanche, PMS, and CorrectHealth) contracted with the state to manage mental healthcare at EBRPP. Accordingly, the Court concludes that all are state actors for § 1983 purposes.

Dr. Bridges also argues that the "present litigation is premature" because Zavala's § 1983 claims against a healthcare provider must be presented to a medical review panel prior to the filing of suit. However, as a court in this district has previously concluded, § 1983 claims based on allegedly intentional or deliberately indifferent conduct are not subject to this requirement. *See Bailey v. E.B.R. Parish Prison*, 2015 WL 545706, at *3 (M.D. La. Feb. 9, 2015) (citations omitted) ("[I]nasmuch as the Louisiana Medical Malpractice Act defines malpractice as an 'unintentional tort or breach of contract,' . . . and inasmuch as a claim for the violation of constitutional civil rights, in contrast, involves intentional wrongdoing on the part of a state official, or an analogous state of mind described as 'deliberate indifference,' the Louisiana Medical Malpractice Act has no application to Zavala's claim of intentional, willful and malicious wrongdoing.").

Nevertheless, Zavala's claim in Count One names Dr. Bridges as a defendant only in his official capacity. "Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks omitted). Official-capacity suits are, therefore, "treated as a suit against the entity" itself. *Id.* at 166; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). As that claim is also asserted against the City/Parish and CorrectHealth, it is duplicative and should therefore be dismissed. *See, e.g., Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (district court correctly dismissed claims

against municipal officers which "duplicate[d] claims against the respective governmental entities themselves"); *Broussard v. Lafayette City-Parish Consol. Gov't*, 45 F. Supp. 3d 553, 571 (W.D. La. 2014) ("When . . . the government entity itself is a defendant in the litigation, claims against specific individuals in their official capacities are redundant, and for that reason, courts in this circuit have found it is appropriate to dismiss them."). Accordingly, the only surviving claim against Dr. Bridges is the deliberate indifference claim in Count Six brought against him in both his individual and official capacities.

Dr. Bridges argues that this claim, too, should be dismissed because Zavala failed to adequately allege deliberate indifference or a pattern of conduct sufficient to satisfy the requirements of a conditions-of-confinement claim, failure-to-train claim, or municipal policy. (Doc. 27-1 at 10–15). The court need not address the latter issues at this point in the discussion, however, because Count Six is an episodic-acts deliberate indifference claim. Consequently, any discussion relating to conditions of confinement, a failure to train, or municipal liability is simply not relevant. *See, e.g.*, *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 464 (5th Cir. 2015) (stating that when a plaintiff has pled both episodic omission and conditions-of-confinement theories of liability, a court "may properly evaluate each separately").

It is well established that "pretrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001). Because Zavala has not alleged specific facts giving rise to a plausible inference that Dr. Bridges was deliberately indifferent to Fano's medical needs, the Court concludes that he is entitled to qualified immunity due to Zavala's failure to properly allege an underlying constitutional violation. It is important to note that, based on her allegations, Zavala

included Dr. Bridges in her lawsuit because he was the medical director at EBRPP while Fano was detained there. As has been extensively discussed in episodic-act cases, "[d]eliberate indifference is an extremely high standard to meet." *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 280 (5th Cir. 2017). "A prison official acts with deliberate indifference only if (A) he knows that inmates face a substantial risk of serious bodily harm and (B) he disregards that risk by failing to take reasonable measures to abate it." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks omitted). Negligence, "even gross negligence," does not rise to the level of deliberate indifference. *Sanchez*, 866 F.3d at 280. Nor does unsuccessful treatment, medical malpractice, or disagreement with treatment, "absent exceptional circumstances." *Gobert*, 463 F.3d at 346.

With respect to Dr. Bridges, Zavala's factual allegations fall well short of this burden. While Zavala alleges facts bearing on Dr. Bridges' knowledge of and responsibility for EBRPP's allegedly deficient treatment of mentally ill detainees, she points to no acts or omissions by Dr. Bridges specifically that would demonstrate that he drew the inference of serious harm to Fano and continued unabated. Zavala's legal conclusions that all of the individual Defendants, collectively, acted "with deliberate indifference and disregard" for Fano's medical needs and "deprived" Fano of "reasonable and adequate medical and mental health care" are entitled to no deference. *See Iqbal*, 556 U.S. at 679 (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the presumption of truth). Moreover, referring to the Defendants collectively prevents the Court from drawing the inference that Dr. Bridges personally (or any other individual Defendant) acted with subjective deliberate indifference. *See Sanchez*, 866 F.3d at 281 ("Supervisors cannot be held liable for constitutional violations committed within the jail if they had no personal involvement."); *Hinojosa v. Livingston*, 807 F.3d at 684 (factual allegations "lumping [all Defendants] together" should be

disregarded).  Finally, because Zavala has not sufficiently alleged an underlying constitutional violation against Dr. Bridges, her official-capacity claim in Count Six against him necessarily fails. *See, e.g.*, *Sanchez*, 866 F.3d at 280 (requiring an underlying constitutional violation to support an official-capacity episodic-act claim); *Scott*, 114 F.3d at 54 (same).  Accordingly, Dr. Bridges' motion to dismiss (Doc. 27) is granted, and all claims against him will be dismissed without prejudice.

### b.  Dr. Blanche

Counts Six and Seven are individual-capacity "specific act or omission" claims challenging Dr. Blanche's involvement in the events leading to Fano's death, including failing to properly diagnose and treat Fano's illness, removing him from suicide watch, failing to monitor his access to medication, and failing to provide "a semblance of mental health care." (Doc. 23 at 33).  Dr. Blanche contends that he was not working in a "professional capacity" at EBRPP, such that he was not a state actor for purposes of § 1983 and that, in any event, he was not deliberately indifferent to Fano's medical needs. (Doc. 61-1 at 5–9).  The Court has already concluded that Zavala has sufficiently alleged that Dr. Blanche was a state actor and will thus proceed to Dr. Blanche's substantive arguments.

Dr. Blanche next asserts that he is shielded from § 1983 liability for any individual-capacity claims by the doctrine of qualified immunity.[3]  Again, to survive a motion to dismiss on qualified immunity grounds, Zavala need only allege that Dr. Blanche violated her son's constitutional rights and that his actions were objectively unreasonable in light of clearly established law. *See Hinojosa*,

---

[3] Zavala seems to assert that qualified immunity is "only available" to Dr. Blanche for Count Six—the § 1983 deliberate indifference claim asserted against all individual Defendants in their individual and official capacities. (*See* Doc. 67 at 10).  While she is correct that qualified immunity is only available for individual-capacity claims, both Count Six and Count Seven are individual-capacity § 1983 claims against Dr. Blanche. (*See* Doc. 23 at 32–33). Accordingly, Dr. Blanche's qualified immunity defense applies to both of these claims.

807 F.3d at 669. Here again, Zavala has failed to sufficiently allege that Fano's constitutional rights were violated under an episodic-acts theory of liability.

In the amended complaint, Zavala alleges that Dr. Blanche violated Fano's constitutional rights by "failing to properly diagnose and treat Mr. Fano's mental illness, including removing Mr. Fano from suicide watch, failing to monitor access to his medication, and failing to provide a semblance of mental health care." (Doc. 23 at 33). According to Zavala, Dr. Blanche determined that Fano was not suicidal one day after he was placed on suicide watch after evaluating him "through the bars of his cell" because it was difficult to move him, and "not for any valid medical reason." (*Id.* at 12). Later, after Fano requested an appointment and complained that his medications were not working, causing anxiety and sleeplessness, Dr. Blanche never saw him. (*Id.* at 13). In January 2017, two weeks before Fano's suicide, Dr. Blanche assessed him, again from the outside of Fano's cell, and discontinued the use of antipsychotic medication because he "doubted" that Fano suffered from "serious mental illness." (*Id.* at 15). Further, he knew, or should have known, that both EBRPP's mental healthcare generally and Fano's care specifically were inadequate but failed to intervene. (*See id.* at 32–33).

Even accepting these facts as true, as it must at the motion-to-dismiss stage, the Court concludes that Zavala's allegations against Dr. Blanche do not rise to the level of deliberate indifference. The allegations are that Dr. Blanche was aware that Fano was at risk for suicide, but acted objectively unreasonably by providing what Zavala characterizes as inadequate, cursory examinations of Fano's condition through the bars of his cell, before concluding that Fano's medication needed to be reduced and ultimately discontinued. She also alleged that Fano had multiple medical appointments that were not kept, including several immediately before the transition from PMS to CorrectHealth at the end of 2016. However, she does not specifically

29

contend that Dr. Blanche himself failed to keep any scheduled appointments with Fano, let alone that he did so deliberately with a conscious disregard for Fano's wellbeing. Of course, to properly allege deliberate indifference, Zavala must show that Dr. Blanche refused to treat Fano, "ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson*, 759 F.2d at 1238. She has not done so. At most, she has alleged that Dr. Blanche negligently treated Fano's mental health condition and that she disagreed with the care provided by Dr. Blanche, but even gross negligence is insufficient to satisfy the deliberate-indifference standard. So too are "[d]isagreements regarding the proper course of treatment or the failure to provide optimal care." *Perniciaro*, 2018 WL 3941607, at *10.

Further, Zavala's reliance on this Court's opinion in *Cleveland* to support her episodic-acts claim against Dr. Blanche is unavailing. While Zavala correctly points out that *Cleveland* also centered on mental health treatment at EBRPP and a pretrial detainee's eventual suicide, the facts alleged there are easily distinguishable from those in the amended complaint here for deliberate-indifference purposes. In *Cleveland*, not only did the allegations include who at the prison was informed of the detainee's mental illness, but also that the detainee was deprived of his prescribed medications and a wheelchair and shackled. Further, the plaintiff alleged that medical staff refused to treat him when he suffered a heart attack or transport him to the hospital, and eventually tased him and slammed him into a cell door. *See Cleveland*, 198 F. Supp. 3d at 726–28. As the Court explained, the plaintiff in that case alleged that prison and PMS officials "prevented Cleveland form receiving recommended treatment," which, if proven, could constitute deliberate indifference. *Id.* at 743. Here, Zavala admits that Fano was treated by multiple medical staff members at EBRPP, including Dr. Blanche. While she disagrees with the methods, quality, and

level of the treatment and its efficacy, these allegations do not meet the legal definition for deliberate indifference. Thus, despite the overall similarities in the posture of the two cases, the specific facts alleged in *Cleveland* giving rise to a plausible episodic-act claim are simply not present here.

Crucially, to overcome a claim of qualified immunity, a plaintiff "must allege facts *specifically* focusing on the conduct of [the defendant] which caused [the] injury." *Wicks v. Miss. State Emp't Serv.*, 41 F.3d 991, 995 (5th Cir. 1995) (emphasis added). This requires "more than bald allegations and conclusory statements." *Id.* Here, Zavala has fallen short of this burden. Accordingly, Dr. Blanche's motion to dismiss (Doc. 61) must be granted, and the claims in Counts One,[4] Six, and Seven against him are dismissed without prejudice.

### c. The City/Parish, Simpson, and PMS

Zavala has agreed to dismiss all pending claims against PMS. (*See* Doc. 48 at 1 n.2). However, she vigorously argues that she has stated plausible § 1983 and state-law claims against the City/Parish and Simpson. Counts One and Two are asserted against both the City/Parish and Simpson in her official capacity. (Doc. 23 at 26–27). Additionally, Counts Three and Four are asserted against the City/Parish, and Count Six names Simpson in her individual and official capacity. (*Id.* at 28–31 & 32–33).

As an initial matter, Zavala's claims against Simpson in her official capacity are due for dismissal. Because Zavala has named the City/Parish as a Defendant in Counts One and Two and because the City/Parish contracted with Simpson's employer, PMS, to manage healthcare at EBRPP, Zavala's official-capacity claims against Simpson are duplicative of her claims against

---

[4] Like the other official-capacity claims that are also asserted against the City/Parish and CorrectHealth, the official-capacity claim against Dr. Blanche in Count One must also be dismissed because it is duplicative.

the City/Parish. Accordingly, these claims will be dismissed. *See, e.g.*, *Castro Romero*, 256 at 355; *Broussard*, 45 F. Supp. 3d at 571.

With respect to Count Six, Simpson asserts that she was not employed by PMS as the interim director of healthcare at EBRPP when Fano was incarcerated and "played no first-hand role in the treatment of any inmate/patient, including Mr. Fano." (Doc. 34-1 at 8). Therefore, according to Simpson, she cannot be held liable in her individual capacity for deliberate indifference "to the medical needs of an inmate she does not know." (Doc. 34-1 at 12). As Zavala alleged that Simpson served as the interim director until December 31, 2016, two months after Fano's arrest, her episodic-acts claim for deliberate indifference against Simpson could turn on whether the Court considers the affidavit attached to Simpson's motion. (*See* Doc. 34-2). In fact, Zavala herself concedes in briefing that any individual-capacity claim asserted against Simpson hinges on the timing of Simpson's employment with PMS. (*See* Doc. 48 at 11 n.40).

The Court need not reach the issue of Simpson's affidavit, however, because Zavala's deliberate indifference claim against her in her individual capacity fails for another reason entirely. Even accepting the allegation that Simpson, through her role at PMS, was in charge of healthcare services at EBRPP until December 31, 2016, Zavala has not alleged how Simpson's conduct was deliberately indifferent to Fano's needs separate and apart from her role as a policymaker. Indeed, Zavala sued Simpson "as the interim director of PMS" and makes allegations regarding Simpson's responsibility for the status of mental healthcare at EBRPP generally. (*See* Doc. 23 at 4 & 22–23). But she does not allege that Simpson ever treated Fano or even met him, let alone how Simpson may have been deliberately indifferent such that she could be subject to episodic-act liability. This forecloses any individual-capacity deliberate indifference claim against Simpson without regard to the timing of her employment. *See, e.g.*, *Rombach v. Culpepper*, 2018 WL 1202556, at *5 (E.D.

La. Mar. 8, 2018) (individual defendants were entitled to qualified immunity on individual-capacity deliberate indifference claims where there was no evidence that either defendant "personally violated [the plaintiff's] constitutional rights" or was "aware of [the plaintiff's] medical needs").

Zavala's § 1983 conditions-of-confinement claims against the City/Parish survive, however. The Court notes at the outset of this discussion the City/Parish's assertion that it has "nothing to do with the operation of" EBRPP and is only obligated under Louisiana law to "provide the jail and pay for its maintenance." (Doc. 34-1 at 11). Leaving aside the factual issue of which entity, in practice, was responsible for which policies and procedures Zavala alleges do not pass constitutional muster, Zavala clearly alleges that the City/Parish's policy of inadequately funding EBRPP contributed to systematic constitutional deprivations and ultimately resulted in Fano's suicide. As the City/Parish has conceded, it is legally responsible for funding its own prisons. *See* LA. REV. STAT. ANN. § 15:702 ("The governing authority of each parish shall be responsible for the physical maintenance of all parish jails and prisons."). And it is the parish's responsibility under Louisiana law to provide medical care for its prisoners, *see* LA. REV. STAT. ANN. § 15:703, which the City/Parish has done by contracting first with PMS and then with CorrectHealth to provide healthcare services at EBRPP. Accordingly, although it would be premature at this stage of the proceedings for either the parties or the Court to conclusively determine which entity—the City/Parish, the Sheriff's Office, or PMS/CorrectHealth—had which specific responsibilities at EBRPP, Zavala has met her burden to plead a policy by the City/Parish (inadequate funding) that

led to systematic constitutional violations. *See, e.g.*, *O'Quinn*, 773 F.2d at 609 (concluding, based on Louisiana law, that a parish police jury "had a duty to fund and maintain the jail").[5]

While the City/Parish argues that Zavala has failed to identify any specific custom or policy that caused a constitutional deprivation, this assertion mischaracterizes the allegations in the amended complaint. As the Court has already discussed, Zavala specifically alleged that the City/Parish had an "explicit policy of not sufficiently funding and overseeing EBRPP [which] caused defects in physical design and manner of operation, including inadequate staffing, inadequate supervision techniques, and/or poor sightlines at EBRPP." (Doc. 23 at 24). She also alleged de facto policies at EBRPP as a result of "inadequate staffing, inadequate supervision techniques, and poor sightlines," that enabled certain inmates to "prey on" others, resulting in a "continuous pattern of constitutional deprivations." (*Id.* at 21). And she asserts that the individual Defendants knew the insufficient funding "would result in the deprivation" of healthcare services for "prisoners with serious medical conditions, including serious mental health conditions." (Doc. 23 at 26); *see also O'Quinn*, 773 F.2d at 609 ("Where a municipal body is vested with this sort of fiscal obligation to a jail, its liability for insufficient funding or maintenance will depend on its knowledge of conditions at the jail."). Indeed, Zavala alleges in the amended complaint that the City/Parish was notified by its own consultant of serious inadequacies in the medical care provided to detainees and yet deliberately failed to follow the recommendations of that consultant.

Thus, Zavala has alleged that Simpson, Dr. Bridges, and Dr. Blanche were final policymakers for healthcare at EBRPP, which the Court must accept as true.[6] She has alleged a

---

[5] Of course, it is well established that "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986) (internal quotation marks omitted); *see also George v. La. Dep't of Pub. Safety and Corr.*, 272 F. Supp. 3d 855, 888–89 (M.D. La. 2017).

[6] For clarity's sake, the fact that all claims these three individual defendants are being dismissed has no bearing on Zavala's ability to identify any actions they took as final policymakers that could subject the City/Parish to § 1983 liability.

policy of grossly inadequate funding, and she has clearly asserted that this policy is the moving force behind the constitutional deprivation at issue. While the City/Parish states, in conclusory fashion, that "[w]hat the complaint alleges is not supported by any of the alleged facts," (Doc. 34-1 at 10), the Court disagrees and concludes that the preceding facts could, if proven, establish viable § 1983 conditions-of-confinement claims against the City/Parish. Accordingly, for the purposes of municipal liability, Zavala has met her burden at the pleading stage, and the City/Parish's motion to dismiss (Doc. 34) is denied.

### d. CorrectHealth

CorrectHealth seeks dismissal of the constitutional claims asserted in Counts One, Two, and Six. With regard to the conditions-of-confinement claims Counts One and Two, the Court can dispense with CorrectHealth's arguments relatively briefly. CorrectHealth's arguments are mostly temporal, as it contends that the unconstitutional policies of which Zavala complains were instituted—by her own admission—before it took over EBRPP's healthcare. According to Zavala, however, the key systemic deficiencies that contributed to Fano's suicide continued after CorrectHealth began providing medical services on January 1, 2017. For example, she contends that a CorrectHealth staff person concluded that Fano was "faking bad[ly] or exaggerating his condition" and that Dr. Blanche "doubted 'serious mental illness'" and suggested "tapering" his medications. Though these are specific acts, they are, according to Zavala, the product of a mental-health system that was inadequately funded, chronically understaffed, and marred by a complete lack of training—all of which CorrectHealth bore at least some responsibility for after it took over. To the extent Zavala alleges that CorrectHealth employed individuals who carried out or were responsible for the policies she claims were unconstitutionally deficient, Zavala has stated plausible claims in Counts One and Two against CorrectHealth.

CorrectHealth's argument that this is solely an episodic-acts case and Zavala cannot state a plausible conditions-of-confinement claim is not persuasive. Indeed, in *Shepherd*, where the plaintiff alleged that a prison's inadequate healthcare system directly led to his stroke, the Fifth Circuit concluded that his allegations did "not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness." *Shepherd*, 591 F.3d at 453. Because "no single individual's error actually caused [the plaintiff's] hypertensive decline into a stroke," the district court correctly granted summary judgment on the plaintiff's episodic-acts-or-omissions claim. *Id.* at 453 n.2. Identically, Zavala's amended complaint fails to sufficiently allege that any one actor contributed to Fano's suicide such that he or she would be subject to episodic-acts-or-omissions liability. However, she has alleged that systemic deficits in EBRPP's mental healthcare treatment exacerbated Fano's condition and led to his death.

CorrectHealth argues strenuously that to the extent Zavala has alleged any policies, customs, or widespread practices supporting a viable § 1983 claim, it had no responsibility for them. Nevertheless, the Court declines to accept CorrectHealth's invitation to pierce the veil of Zavala's factual allegations and absolve it of any and all liability by determining which entity is responsible for which of the alleged shortcomings of EBRPP's healthcare system. The allegations in the amended complaint are therefore sufficient at this stage of the proceedings to state plausible claims against CorrectHealth under the theories of liability contained in Counts One and Two. These claims against CorrectHealth will survive.

With regard to deliberate indifference, however, Zavala has not alleged facts that would subject CorrectHealth to liability. Again, an episodic-act-or-omission claim requires first an allegation of "a particular act of, or omission by, [an individual which] then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or

omission." *Scott*, 114 F.3d at 53.  While the Court has extensively discussed the fact that Zavala successfully met her burden to plead a policy or custom, the amended complaint falls short of alleging an act or omission by an individual affiliated with CorrectHealth rising to the level of deliberate indifference.  Accordingly, Zavala's claim against CorrectHealth in Count Six is dismissed without prejudice.

### e.  Gautreaux, Grimes, and Nova[7]

Zavala has asserted Counts One through Four against Gautreaux in his official capacity and Counts Five and Six against both Gautreaux and Grimes in their individual and official capacities.  She also brings Counts Three and Four against Grimes in his official capacity. Consistent with the same claims against the other Defendants and for identical reasons, the episodic-acts deliberate indifference claims against both Gautreaux and Grimes in their individual capacities are dismissed without prejudice, while their motion to dismiss the remaining claims will be denied.

### i.  Counts One Through Four

It bears little repeating that Zavala has alleged in extensive detail that EBRPP had a policy of housing mentally ill inmates in solitary confinement without any legitimate, non-punitive governmental objective, and otherwise failing to properly care for their medical needs.  According to Zavala, not only was there a policy of inadequate funding, but limited medical staff, significant barriers to healthcare, and poor conditions.  Additionally, there was no suicide training at EBRPP provided to healthcare staff for over one year and to corrections staff in several years. (Doc. 23 at 19).  Finally, she alleges de facto policies at EBRPP as a result of "inadequate staffing, inadequate supervision techniques, and poor sightlines," that enabled certain inmates to "prey on" others,

---

[7] As the liability insurer for Gautreaux and Grimes, Nova's potential liability is tied to Gautreaux and Grimes' under Louisiana law. *See* LA. REV. STAT. ANN. § 22:1269 (2011).

resulting in a "continuous pattern of constitutional deprivations." (*Id.* at 21). She further asserts that each of the Defendants had knowledge of the risk this policy posed to inmates' mental health. (*See id.* at 32) ("All of these Defendants knew EBRPP had inadequate mental health staffing to address mental health needs of EBRPP prisoners, including Mr. Fano . . . .").

In essence, Gautreaux and Grimes argue that the City/Parish—and not the Sheriff's Office––is responsible for healthcare at EBRPP, that the City/Parish contracted with PMS and CorrectHealth to provide health services, and that neither Gautreaux nor Grimes therefore bear any responsibility for unconstitutionally inadequate healthcare at EBRPP. This argument misses the mark. First, Zavala alleges that the Sheriff's Office contracted with both PMS and CorrectHealth to provide healthcare services at EBRPP.[8] (*See id.* at 4–5). Moreover, Zavala points to several specific policies she alleged Gautreaux and Grimes implemented that directly contributed to Fano's death, including a policy of "using solitary confinement as punishment *and* a warehouse for those with serious mental illness," and the lack of "a consistent monitoring or rating system to standardize the delivery of mental health care to prisoners on suicide watch." (*Id.* at 21). Additionally, Zavala alleges that Gautreaux and Grimes are responsible, at least in part, for EBRPP's inadequate funding.

Zavala's claims in Counts One through Four survive against Gautreaux and Grimes for the same reason they survived against the City/Parish and CorrectHealth. As for Counts One and Two, Zavala has alleged that Gautreaux and Grimes were policymakers, that they are responsible for the unconstitutionally deficient policies discussed above, and that these policies were the moving force

---

[8] To the extent a document (Doc. 59-1) attached to Zavala's brief in opposition to Gautreaux, Grimes, and Nova's motion contradicts this allegation, the Court is unable to consider this document because it was neither attached to the complaint nor to the motion to dismiss. Moreover, there is no proof before the Court that this is the actual contract eventually signed, nor does the document absolve the Sheriff's Office of any involvement in the agreement as Gautreaux and Grimes suggest.

behind the eventual constitutional deprivation Fano suffered. *See Pineda*, 291 F.3d at 328. Moreover, she has successfully alleged that the system of grossly inadequate mental healthcare was so "pervasive" and "sufficiently extended" that it constituted a de facto policy. *See Shepherd*, 591 F.3d at 452. Accordingly, the official-capacity claims in Counts One through Four against Gautreaux and Grimes will survive their motion to dismiss.[9]

### ii. Counts Five and Six

Count Five is a failure-to-supervise claim in which Zavala alleges that Gautreaux and Grimes failed to properly supervise their subordinates to prevent the systemic deficits that led to Fano's suicide. Count Five is brought against Gautreaux and Grimes in both their individual and official capacities. For the individual-capacity claims, Gautreaux and Grimes claim they are entitled to qualified immunity. However, Zavala's factual allegations are plainly sufficient to defeat qualified immunity and state a viable claim. Zavala asserts that Gautreaux and Grimes failed to supervise their employees to properly screen prisoners with serious mental health conditions, provide access to appointments, identify suicidal inmates, ensure access to medications, protect vulnerable inmates from larger and stronger inmates, and institute proper quality-control measures to alleviate the chronic shortcomings revealed in the HMA report.

As the Court has already discussed, supervisors not personally involved in a constitutional deprivation can still be liable where they institute "unconstitutional policies that causally result in the constitutional injury" and have either acted or failed to act with "deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Gates*, 537 F.3d at 435 (emphasis omitted). Moreover, "[a] failure to adopt a policy can be deliberately indifferent when

---

[9] Gautreaux and Grimes, like CorrectHealth, characterize Zavala's lawsuit as an episodic-acts case in an attempt to dismiss her conditions-of-confinement claims. (*See* Doc. 47-1 at 19). However, as the Court has already concluded and as is clear from the Amended Complaint, Zavala's allegations fit more cleanly within a conditions-of-confinement theory of liability. *See Shepherd*, 591 F.3d at 453.

it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992). In either instance, "deliberate indifference" requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks omitted). This requires "actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights and the actor nevertheless chooses to retain that program." *Porter*, 659 F.3d at 447 (internal quotation marks omitted). A "pattern of similar constitutional violations by untrained employees is ordinarily necessary" because without notice of a deficiency, a supervisor "can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62 (internal quotation marks omitted).

Gautreaux and Grimes correctly assert that they can only be held liable for their own conduct, and not on a theory of vicarious liability, but this does not end the Court's inquiry. They argue that Zavala's statements concerning the basis for their supervisory liability are conclusory; however, the Court concludes that the above statements provide a quite specific basis for Gautreaux and Grimes' alleged supervisory failures. A conclusory statement entitled to no assumption of truth at the motion-to-dismiss stage is one that pleads "threadbare recitals of a cause of action's elements." *Iqbal*, 556 U.S. at 678. Here, Zavala has done much more. While her allegations may not be factually detailed enough for Gautreaux and Grimes' liking, they are sufficient at the pleading stage to state a viable supervisory liability claim. Accepting the truth of these allegations, as the Court must, Zavala has satisfactorily alleged that Gautreaux and Grimes implemented policies and procedures, such as the policy of placing severely mentally ill prisoners in solitary confinement, "so deficient that the [policies themselves are] a repudiation of

constitutional rights and [are] the moving force behind the constitutional violation." *Cozzo*, 279 F.3d at 289.

Further, Zavala has alleged that the *absence* of any procedures for adequately treating mentally ill inmates caused Fano's death here, and that this omission has caused a pattern of similar constitutional deprivations at EBRPP in the past. For example, she alleges that Gautreaux and Grimes had no "consistent monitoring or rating system to standardize" mental health treatment for suicidal prisoners. (Doc. 23 at 21). She also asserts that, despite the HMA report documenting several alleged serious deficiencies in the EBRPP healthcare system, prior suicides, and its high mortality rate, Gautreaux and Grimes both failed to ameliorate existing policies (like placing mentally ill prisoners in solitary confinement and poor conditions) and chose not to institute prophylactic measures to prevent future similar incidents. All of these systemic failures, according to Zavala, directly led to Fano's death in this case. If these allegations are true, it is certainly plausible that a deprivation of constitutional rights would be a likely consequence. Thus, Zavala's supervisory liability claim against both Gautreaux and Grimes in their individual and official capacities in Count Five will survive their motion to dismiss.

The Court reaches a different conclusion regarding Zavala's episodic-act claim for deliberate indifference in Count Six, however. As is the case with this claim against each of the other individual Defendants, and her failure-to-train allegations notwithstanding, Zavala has failed to point to specific acts of omissions by either Gautreaux or Grimes that would rise to the level of deliberate indifference to Fano's rights. This claim will therefore be dismissed with prejudice as to Gautreaux and Grimes in both their individual and official capacities.

### f. State-Law Claims

Zavala asserts three state-law claims against all Defendants: loss of consortium (Count Ten), wrongful death (Count Eleven), and survival action (Count Twelve). She also seeks to hold Nova liable for the acts of its insureds (Count Thirteen) and asserts a claim for breach of duty to provide medical treatment (Count Fourteen) against Gautreaux. Zavala has since voluntarily dismissed all state-law claims against Dr. Blanche and Dr. Bridges. (Docs. 57 & 58). Additionally, the City/Parish and Simpson raise no substantive argument against the state-law claims, instead asserting, without explanation, that the Court should decline to exercise its supplemental jurisdiction over those claims. (*See* Doc. 34-1 at 13). Because the Court holds today that certain federal claims will survive the pending motions to dismiss, it will not accept the invitation to decline to exercise its supplemental jurisdiction over Zavala's state-law claims.

The pending motions seek dismissal of those state-law claims still outstanding on three bases: (1) Gautreaux is not the employer of any of the individual Defendants and is therefore not vicariously liable, (2) the claims are premature for Zavala's prior failure to present them to a medical review panel, and (3) the claims should be remanded if Zavala's federal claims are dismissed. (*See* Doc. 34-1 at 13; Doc. 40-1 at 13–14; Doc. 47-1 at 27–28).

Of course, for the same reason the Louisiana Medical Malpractice Act does not foreclose any of Zavala's surviving § 1983 claims, it also does not doom any state-law claims based on allegedly intentional or deliberately indifferent conduct. *See, e.g.*, *Bailey v. E.B.R. Parish Prison*, 2015 WL 545706, at *3 (M.D. La. Feb. 9, 2015) (citations omitted) ("[I]nasmuch as the Louisiana Medical Malpractice Act defines malpractice as an 'unintentional tort or breach of contract,' and inasmuch as a claim for the violation of constitutional civil rights, in contrast, involves intentional wrongdoing on the part of a state official, or an analogous state of mind described as 'deliberate indifference,' the Louisiana Medical Malpractice Act has no application to Zavala's claim of

intentional, willful and malicious wrongdoing.").  Accordingly, and because no other substantive argument has been brought against these claims, the state-law claims still outstanding will survive.

Nevertheless, Zavala failed to devote any of her brief to a rebuttal of Gautreaux's argument that he cannot be held vicariously liable for Zavala's state claims because he does not employ any of the individual Defendants except Grimes.  It is well established that a plaintiff's failure to defend a claim in her response to a motion to dismiss constitutes abandonment of that claim. *See, e.g.*, *Matter of Dallas Roadster, Ltd.*, 846 F.3d 112, 126 (5th Cir. 2017).  Because Zavala failed to respond to these contentions, she has abandoned her state-law claims against Gautreaux.  Because Grimes did not move for dismissal of any of the state-law claims against him, those claims remain undisturbed.

### g.  Leave to Amend

In summary, the Court has dismissed all claims against PMS, Rintha Simpson, Dr. Bridges, and Dr. Blanche, as well as the claim asserted in Count Six against all Defendants.  The remaining state and federal claims will survive the pending motions to dismiss.  Because it dismisses these claims without prejudice, however, the Court must now decide whether to grant Zavala leave to amend her complaint.

The Court will do so.  "[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." Byrd v. Bates, 220 F.2d 480, 482 (5th Cir. 1955).  The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Relying on *Great Plains* and other cases from this circuit, one district court in Texas articulated

the standard as follows:

> When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.") (internal citation omitted). However, a court may deny leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1487 (2d ed.1990) (footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999) ("A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.") (footnote omitted).

*Tow v. Amegy Bank N.A.*, 498 B.R. 757, 765 (S.D. Tex. 2013).  Finally, one leading treatise

explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 1357 (3d ed.

2016).

Here, while Zavala has not formally requested leave to amend, the Court will act in accordance with "wise judicial practice" and the general rule permitting leave to amend before dismissal with prejudice and grant Zavala the opportunity to do so.

## V.    CONCLUSION

Accordingly, for the foregoing reasons, **IT IS ORDERED** as follows:

(1)  The motion to dismiss filed by Charles Bridges (Doc. 27) is **GRANTED**, and all claims asserted against him are **DISMISSED WITHOUT PREJUDICE**;

(2)  The motion to dismiss filed by Robert Blanche (Doc. 61) is **GRANTED**, and all claims asserted against him are **DISMISSED WITHOUT PREJUDICE**;

(3)  The motion to dismiss filed by Prison Medical Services (Doc. 34) is **GRANTED**, and all claims asserted against it are **DISMISSED WITHOUT PREJUDICE**;

(4)  The motion to dismiss filed by Rintha Simpson (Doc. 34) is **GRANTED**, and all claims against her are **DISMISSED WITHOUT PREJUDICE**;

(5)  The motion to dismiss filed by the City/Parish (Doc. 34) is **DENIED**;

(6)  The motion to dismiss filed by CorrectHealth, LLC (Doc. 40) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** in that the claim against CorrectHealth in Count Six (for episodic acts or omissions) is **DISMISSED WITHOUT PREJUDICE**.  In all other respects, the motion is **DENIED**;

(7)  The motions to dismiss filed by Sid J. Gautreaux, III, Dennis Grimes, and Nova Casualty Company (Doc. 47) are **GRANTED IN PART and DENIED IN PART**. The motions are **GRANTED** in that all claims asserted against them in Count Six (for episodic acts or omissions in their individual and official capacities) are **DISMISSED WITHOUT PREJUDICE**.  In all other respects, the motions are **DENIED**; and

(8)  Zavala shall file a second amended complaint on or before **October 18, 2018**, to the

extent she wishes to cure any of the deficiencies described above.  The deficient claims

not amended will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on <u>September 20, 2018</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**