UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MARIA OLGA ZAVALA                                             CIVIL ACTION NO.

VERSUS                                                        17-656-JWD-EWD

CITY OF BATON ROUGE, ET AL.

## RULING AND ORDER

Before the Court are three opposed Motions to Compel,[1] filed by Maria Zavala ("Plaintiff") against Defendant CorrectHealth Baton Rouge, LLC ("CorrectHealth"). For the reasons that follow, the First Motion to Compel[2] is granted in part; the Third[3] and Fourth[4] Motions to Compel are denied as untimely.

**I.    Background**

Plaintiff's son, Louis Fano ("Fano"), died in February 2017 following an apparent suicide while incarcerated in the East Baton Rouge Parish Prison ("EBRPP").[5] Plaintiff alleges that defendants[6] failed to protect Fano from harm and were deliberately indifferent to his medical needs in violation of 42 U.S.C. § 1983.[7] Plaintiff's First Motion to Compel[8] seeks an order compelling

---

[1] A magistrate judge may "hear and determine" non-dispositive pre-trial motions pursuant to 28 U.S.C. § 636(b)(1)(A). "A motion to compel is a nondispositive, pretrial discovery motion." *Tingle v. Hebert,* No. 15-626, 2017 WL 2543822, at *1 (M.D. La. June 12, 2017) *citing State Farm Mut. Auto. Ins. Co. v. Friedman*, No. 98-2918, 2002 WL 649417, at *1 (N.D. Tex. Jan. 14, 2002) (*citing Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995)). *See Turner v. Hayden*, No. 15-2282, 2016 WL 6993864, at *1 (W.D. La. Nov. 29, 2016) ("The decision by Magistrate Hornsby to deny Turner's Motion to Compel Discovery is a non-dispositive matter."); *In re Tex. Bumper Exchange, Inc.*, No. 05-50305, 333 B.R. 135, 138 (Bankr. W.D. Tex. Sept. 26, 2005) (holding bankruptcy court's order granting motion to compel discovery was an interlocutory order as the order concerned a nondispositive discovery issue and did not dispose of the merits of litigation).
[2] R. Doc. 118.
[3] R. Doc. 135.
[4] R. Doc. 136. A Second Motion to Compel was filed by Plaintiff against CorrectHealth (R. Doc. 122), but the parties were able to resolve the issues raised in the Second Motion to Compel. *See*, R. Doc. 123.
[5] R. Doc. 23, ¶¶ 54, 106, *et seq.*
[6] The City of Baton Rouge/Parish of East Baton Rouge (the "City-Parish") is the only other remaining defendant. All the other named defendants have been dismissed, including Sid J. Gautreaux, the Sheriff of EBRPP; Dennis Grimes, the Warden of EBRPP; and Nova Casualty Company, their insurer (the "Sheriff Defendants").
[7] R. Doc. 23, introductory paragraph, ¶¶ 106, *et seq.*
[8] R. Doc. 118 *and see* Opposition at R. Doc. 127 and Plaintiff's Reply at R. Doc. 130.

CorrectHealth to produce the multidisciplinary mortality review and psychological autopsy CorrectHealth prepared in connection with Fano's death. Plaintiff's Third Motion to Compel[9] seeks an order requiring CorrectHealth to produce similar documents regarding the deaths of fifteen other EBRPP detainees. Plaintiff's Fourth Motion to Compel[10] seeks production of electronically stored information ("ESI"), specifically emails regarding inmate suicides at other CorrectHealth facilities that occurred three years before Fano's death. The undersigned conducted a telephone conference on October 4, 2019,[11] and an in-person conference on November 20, 2019,[12] regarding the issues raised in these Motions.

## II. Law and Analysis

### A. Legal Standards

Under the Federal Rules of Civil Procedure, parties may obtain discovery regarding any nonprivileged matter that is relevant to a claim or defense[13] and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.[14] A court must additionally limit the frequency or extent of discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii)

---

[9] R. Doc. 135. *See also* CorrectHealth's opposition memorandum (R. Doc. 147) and Plaintiff's reply (R. Doc. 155).
[10] R. Doc. 136. *See also* CorrectHealth's opposition memorandum (R. Doc. 145) and Plaintiff's reply at (R. Doc. 152).
[11] R. Doc. 123.
[12] R. Doc. 141.
[13] *Crosby v. Louisiana Health Service and Indem. Co.,* 647 F.3d 258, 262 (5th Cir. 2011) ("Generally, the scope of discovery is broad and permits the discovery of 'any nonprivileged matter that is relevant to any party's claim or defense.'"), *citing* Fed. R. Civ. P. 26(b)(1) and *Wyatt v. Kaplan,* 686 F.2d 276, 283 (5th Cir. 1982).
[14] Fed. R. Civ. P. 26(b)(1).

the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."[15]

Rule 34 of the Federal Rules of Civil Procedure provides for the discovery of documents and tangible things:

> (a) In General. A party may serve on any other party a request within the scope of Rule 26(b):
> (1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
> (A) any designated documents or electronically stored information – including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
> (B) any designated tangible things….

Under Rule 34, a party has 30 days after service of discovery to respond or object in writing to the request for production.[16] If a party fails to respond fully to a request for production in the time allowed by Rule 34(b)(2)(A), the party seeking discovery may move to compel disclosure and for appropriate sanctions under Rule 37. "An evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."[17] "Once a party moving to compel discovery establishes that the materials and information it seeks are relevant or will lead to the discovery of admissible evidence, the burden rests upon the party resisting discovery to substantiate its objections."[18] "A party objecting to discovery 'must state with specificity the

---

[15] Fed. R. Civ. P. 26(b)(2)(C).
[16] Fed. R. Civ. P. 34(b)(2)(A).
[17] Fed. R. Civ. P. 37(a)(4).
[18] *Vasquez v. Conquest Completion Services, LLC,* No. 15-188, 2018 WL 3611891, at *2 (W.D. Tex. Jan. 10, 2018) citing *Cheshire v. Air Methods Corp*, No. 15-933, 2015 WL 7736649, at *2 (W.D. La. Nov. 30, 2015) (*citing McLeod, Alexander, Powel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)).

objection and how it relates to the particular request being opposed, and not merely that it is 'overly broad and burdensome' or 'oppressive' or 'vexatious' or 'not reasonably calculated to lead to the discovery of admissible evidence.'"[19]

Where, as here, the case concerns issues of federal law, federal common law governs attorney client privilege.[20] "For a communication to be protected under the privilege, the proponent 'must prove: (1) that he made a *confidential* communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding.'"[21] The attorney client privilege does not extend to materials assembled in the ordinary course of business, or which provide purely factual data.[22] The privilege applies whether an attorney works at a law firm or works as in-house counsel for a corporation.[23]

The party claiming the privilege bears the burden of proof, and this is a highly fact-specific inquiry.[24] Ambiguities with respect to whether the elements of a privilege claim have been met

---

[19] *Vasquez,* 2018 WL 3611891 at *2, *citing Cheshire,* 2015 WL 7736649 at *4 (*quoting Reyes v. Red Gold, Inc.*, No. 05-191, 2006 WL 2729412, at *1 (S.D. Tex. Sept. 25, 2006)).

[20] *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 218 F.R.D. 125, 133 (E.D. Tex. 2003), citing *Caver v. City of Trenton,* 192 F.R.D. 154, 159–60 (D.N.J. 2000); *Smith v. Smith,* 154 F.R.D. 661, 671 (N.D. Tex.1994) ("In cases where a federal question exists, the federal common law of attorney client privilege applies even if complete diversity of citizenship is also present." That said, however, "federal common law and Louisiana statutory law are materially similar concerning the attorney client privilege." *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, No. 11-633, 2014 WL 29451, at *6, n. 7 (M.D. La. Jan. 3, 2014) (*citing Akins v. Worley Catastrophe Response, LLC*, No. 12-2401, 2013 WL 796095, at *11 (E.D. La. March 4, 2013); *Soriano v. Treasure Chest Casino, Inc.*, No. 95-3945, 1996 WL 736962, at *2 (E.D. La. Dec. 23, 1996) (federal "common law and Louisiana statutory law are materially similar in this case in regards to attorney client privilege")). Thus, federal decisions construing the privilege in diversity cases involving the application of Louisiana law are relevant.

[21] *Equal Employment Opportunity Commission v. BDO USA, LLP*, 876 F.3d 690, 2017 WL 5494237, at *3 (5th Cir. 2017) (*citing United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)). *See also Swoboda v. Manders*, No. 14-19, 2016 WL 2930962, at *5, n. 41 (M.D. La. May 19, 2016) (recognizing that not all communications between an attorney and his client are privileged, "'[f]or example, no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer.'") (*citing In re Allen*, 106 F.3d 582, 602 (4th Cir. 1997)); *U.S. v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981) (explaining that work papers produced by an attorney in the course of preparing client's tax returns were not privileged "because although preparation of tax returns by itself may require some knowledge of the law, it is primarily an accounting service. Communications relating to that service should therefore not be privileged, even though performed by a lawyer.").

[22] *See U.S. v. Louisiana*, No. 11-470, 2015 WL 4619561, at *5 (M.D. La. July 31, 2015).

[23] *Ferko,* 218 F.R.D. at 133, *citing, e.g.*, *In re Sealed Case,* 737 F.2d 94, 99 (D.C. Cir.1984) (concluding that status as an in-house attorney "does not dilute the privilege," but stating that the privilege applies only if the attorney gave advice "in a professional legal capacity").

[24] *BDO*, 2017 WL 5494237, at *3.

4

are construed against the proponent of the privilege.[25] Once the privilege is established, the burden shifts to the party seeking the documents to prove an applicable exception.[26]

### B. First Motion to Compel – Autopsy Documents as to Fano

#### 1. Plaintiff's Original Arguments

The First Motion to Compel[27] relates to Requests for Production of Documents seeking, through several different requests, "any document composed by Defendant CorrectHealth that reviews the reasons for, circumstances of, and events leading up to Mr. Fano's suicide on February 2, 2017" at EBRPP,[28] and associated ESI,[29] as well as the documents that should have been generated by operation of CorrectHealth's "Procedure In the Event of An Inmate Death" (the "Inmate Death Policy").[30] The Inmate Death Policy states that all inmate deaths will be reviewed to determine the appropriateness of clinical care and whether changes to practices, policies or procedures are warranted. This includes conducting of a multidisciplinary mortality review ("mortality review").[31] Additionally, the Inmate Death Policy provides that when the cause of death is suicide, a psychological review will be conducted as part of the mortality review process.[32] According to Plaintiff, the mortality review (which is also specifically requested at Request for Production No. 25),[33] potentially results in the creation of other documents, such as a "Corrective Action Plan" and records of staff interviews.[34] The mortality review and psychological review/autopsy are collectively the "autopsy documents."

---

[25] *Id.*
[26] *Id.*
[27] R. Doc. 118 *and see* R. Docs. 127 and 130.
[28] R. Doc. 118-1, pp. 2-6 *and see* R. Doc. 118-3 (Requests for Production) for Plaintiff's other requests.
[29] While the First Motion to Compel alleges that CorrectHealth has failed to produce ESI, CorrectHealth contends that the parties have resolved this issue. R. Doc. 127, p. 11.
[30] R. Doc. 118-5.
[31] *Id.*
[32] *Id.*
[33] *See* R. Doc. 118-3, p. 13 (reproduced at R. Doc. 118-1, p. 2): "25. Any administrative review, mortality or morbidity investigation or review, psychological autopsy, or similar, relating to Mr. Fano's death."
[34] R. Doc. 118-1, p. 5 and R. Doc. 118-5.

5

In response to CorrectHealth's objection to production the autopsy documents on the basis of attorney client privilege, Plaintiff argues that the autopsy documents are not privileged because the documents are prepared in the ordinary course of business pursuant to CorrectHealth's policies requiring their preparation regardless of litigation and because they were not prepared in anticipation of litigation.[35] Plaintiff likewise contends that the "psychological autopsy"[36] relating to Mr. Fano's death is generated pursuant to the explicit terms of CorrectHealth's Suicide Prevention Program Policy ("Suicide Prevention Policy"). The Suicide Prevention Policy provides that "Every suicide attempt is considered to be a sentinel event" subject to review by several individuals, and that "A psychological autopsy for each suicide will be completed within 30 days of the event as a part of the Mortality Review process."[37]

Plaintiff also relies on deposition testimony from CorrectHealth's director for clinical services in Louisiana, Jean Llovet ("Llovet").[38] Llovet testified that "M and Ms," *i.e.*, morbidity/mortality reviews at which psychological autopsies are reviewed, are conducted for quality assurance by CorrectHealth's attorneys with the provider staff and as a matter of CorrectHealth's written policy, regardless of whether there is any litigation.[39]

---

[35] R. Doc. 118-1, pp. 11-12 (case citations omitted).
[36] The briefs and exhibits sometimes refer to this document as a "psychiatric autopsy." *See, e.g.,* R. Doc. 127, p. 1, *et seq.*
[37] R. Doc. 118-1, pp. 9-11 *citing* R. Doc. 118-5 and R. Doc. 118-9 (*see* better copy at R. Doc. 130-3, pp. 7-11), and *citing* the deposition testimony of David S. Jennings ("Jennings"), LCSW, in *Belcher, et al. v. Lopinto*, *et al.*, No. 18-7368 (E.D. La.) matter ("*Belcher*") regarding a psychiatric autopsy Jennings prepared pursuant to the Suicide Prevention Policy in effect at the Jefferson Parish Correctional Center ("JPCC") located in Gretna, Louisiana, regarding the suicide of the plaintiffs' son, who was an inmate at JPCC. A different CorrectHealth entity, CorrectHealth Jefferson, provides medical services at JPCC.
[38] R. Doc. 118-1, pp. 10-11 and R. Doc. 118-11, pp. 4, 6 (Llovet testimony).
[39] R. Doc. 118-10, pp. 5, 7 *and see id.*: Q. "And you agree that the M and M review is conducted as a matter of written policy by CorrectHealth?" A. "Yes." Q. "And you agree that that review is conducted regardless of whether there is any litigation, correct?" A. "Correct." Q. "And so they are going to do that review whether a lawyer is involved or not, correct?" A. "Correct." Plaintiff cites to similar testimony of Llovet regarding the preparation of the psychological autopsy but the portion of the deposition transcript containing this testimony was not attached to Plaintiff's memorandum. *See* R. Doc. 118-1, p. 11.

6

As to the importance of the information sought, Plaintiff argues that the autopsy documents have been produced in other cases involving the same or similar claims as those made in this case because they provide a timeline of events and/or may include important non-medical details that shed light on prison customs or policies. Plaintiff also asserts that public policy favors production as "The documents at issue involve a public jail that uses public money to provide health care to pretrial detainees. The standard of care in the jail and the causes of suicides are important public knowledge."[40]

Plaintiff relies heavily upon a ruling of the U.S. District Court for the Eastern District of Louisiana in the currently pending *Belcher* litigation, which involves inmate suicides at JPCC, where a different CorrectHealth entity provides medical services. In the ruling, CorrectHealth was required to produce psychological autopsies because the magistrate judge found that they were prepared in the ordinary course of CorrectHealth's business based on CorrectHealth's policies and the testimony of Llovet and Jennings, such that the documents were not protected by attorney client or work product privileges.[41] The magistrate judge also rejected CorrectHealth's reliance on the Louisiana state law peer-review privilege, holding that it was inapplicable because the case involved federal Section 1983 claims and the federal common law applied, which does not recognize a peer-review privilege.[42]

Plaintiff alternatively argues that CorrectHealth failed to provide a privilege log with its discovery responses as required by Fed. R. Civ. P. 26 and thus has not met its burden of showing

---

[40] R. Doc. 118-1, pp. 7-8 *citing, e.g., Johnson v. Dart*, 309 F.Supp.3d 579, 582 (N.D. Ill. 2018) and *Jenkins v. DeKalb Cnty., Georgia*, 242 F.R.D. 652, 660 (N.D. Ga. 2007) (other citations omitted).
[41] R. Doc. 118-12, pp. 4-8, *citing* the September 16, 2019 decision at No. 18-7368 (E.D. La. Sept. 16, 2019), R. Doc. 78.
[42] *Id*. at pp. 8-9.

that a privilege applies. According to Plaintiff, CorrectHealth's failure to provide a privilege log waived any privileges.[43]

### 2. CorrectHealth's Opposition

CorrectHealth reasserts its written objections and argues that the autopsy documents are privileged under the attorney client and/or self-critical analysis/peer-review privileges.[44] CorrectHealth contends that the mortality review is protected under these privileges because, according to the testimony of Dr. Carlo Musso ("Musso") and Dr. Walter Smith ("Smith"), the mortality review meeting is conducted by general counsel after a death, and during the meeting, the executive committee reviews and critiques the clinical care and determines whether to make changes to procedures. General counsel provides legal opinions, answers legal questions, and documents mortality timeline reports and committee comments.[45] According to CorrectHealth, the attorney client privilege applies regardless of the threat of litigation and attaches whenever a party seeks legal advice or opinions.[46]

Next, CorrectHealth focuses a good deal of its opposition memorandum on the argument that the autopsy documents are protected from disclosure by the self-critical analysis/peer-review privilege afforded by La. R.S. 44:7 and La. R.S. 13:3715.3, which CorrectHealth contends protect records of policy making, remedial action, proposed courses of conduct, and self-critical analysis

---

[43] R. Doc. 118-1, pp. 13-14 (case citations omitted).
[44] CorrectHealth mentions the attorney work product privilege once in brief; however, CorrectHealth's arguments and its privilege logs address the attorney client and self-critical analysis/peer-review privileges. R. Doc. 127, p. 1 and R. Doc. 140-1, pp. 2-3.
[45] R. Doc. 127, pp. 1-2; R. Doc. 127-1 (excerpts of Dr. Musso testimony). The Inmate Death Policy attached to CorrectHealth's opposition memorandum at R. Doc. 127-4 (and opposition memorandum to the Third Motion to Compel at R. Doc. 147-7) is entitled "Clinical Services Operations Policy and Procedure" and is different than the one attached to Plaintiff's First Motion at R. Doc. 118-5 and Plaintiff's Reply at R. Doc. 130-4, pp. 2-4 (and Plaintiff's Third Motion to Compel at R. Doc. 135-14), although they all bear Bates labels appearing to reflect production by CorrectHealth. The Inmate Death Policy attached to Plaintiff's papers appears to specifically relate to CorrectHealth East Baton Rouge, as it is entitled "East Baton Rouge Prison Policy & Procedure," and thus is considered the operative policy.
[46] R. Doc. 127, pp. 2-3, *citing WIII Uptown, LLC v. B&P Restaurant Group, LLC*, No. 15-mc-51, 2016 WL 4620200 (M.D. La. Sept. 2, 2016) (other citations omitted).

of peer-review committees and hospitals. According to CorrectHealth, the applicability of the privilege is determined by an analysis of the three factors set forth in *Jaffe v. Redmond*, (*i.e.*, the public interest, State recognition, and the evidentiary benefit) all of which favor recognizing the privilege in this case.[47] CorrectHealth also attempts to distinguish authority cited by Plaintiff, because CorrectHealth has provided the underlying data pertaining to Fano, his medical records, a timeline of events via Sheriff's log books, and video.[48]

To distinguish the ruling requiring production of the psychological autopsies in *Belcher*, CorrectHealth first notes that the ruling was pending appeal to district judge,[49] and that it only compels production of the psychological autopsy, not the rest of the documents related to the mortality review sought by Plaintiff. CorrectHealth also argues that *Belcher* involves a different entity, CorrectHealth Jefferson, LLC, and that neither Llovet or Jennings are its employees; however, CorrectHealth also says that the testimony of Llovet and Jennings shows that the autopsy documents were created at the instruction of, and used by, legal counsel.[50] Finally, CorrectHealth disputes that it waived any privileges because it produced a privilege log and a supplemental log to Plaintiff after learning during the telephone status conference with the Court that Plaintiff did not receive one.[51]

### 3. Plaintiff's Reply

In Reply, Plaintiff argues that the peer-review privilege does not apply in this jail suicide case based on the "consensus among lower courts and in other circuits that no federal privilege

---

[47] R. Doc. 127, p. 4, *citing* 518 U.S. 1, 10-12 (1996) and CorrectHealth's analysis of the three *Jaffe* factors at *Id.*, pp. 5-8.
[48] R. Doc. 127, pp. 8-9.
[49] Notably, on November 8, 2019, the district judge affirmed the magistrate judge's ruling in *Belcher*. *See* No. 18-7368, 2019 WL 5860744 (E.D. La. Nov. 8, 2019).
[50] R. Doc. 127, pp. 9-10.
[51] R. Doc. 127, pp. 10-11, *citing Louisiana CNI, LLC v. Landmark American Ins. Co.*, 2006 WL 8435026 (M.D. La. 2006); R. Docs. 127-5 and 127-6.

9

protects medical peer-review materials in civil rights or antitrust actions," and that CorrectHealth's authority is factually distinguishable as comprised of cases primarily involving state law and not involving federal claims of deliberate indifference.[52] Plaintiff also contends that the *Jaffe* factors do not support the applicability of the peer-review privilege. According to Plaintiff, the policies of CorrectHealth East Baton Rouge, LLC and CorrectHealth Jefferson, LLC are "virtually identical" and provide that mortality reviews are conducted for quality assurance purposes. Plaintiff argues that the presence of an attorney at the review does not create an attorney client privilege. Finally, Plaintiff urges the Court to consider the tardiness of CorrectHealth's privilege log as further evidence of the weakness in its privilege arguments.[53]

### 4. Conferences & *In Camera* Review

The undersigned discussed the issues raised in the First Motion during both during the October 2019 telephone conference and the November 2019 in-person conference.[54] After the parties' October 2019 telephone conference, CorrectHealth was ordered to produce revised privilege logs to Plaintiff because the logs produced were insufficient, as explained in the undersigned's November 4, 2019 Order.[55] On November 22, 2019, Plaintiff advised the Court that the revised privilege logs did not resolve the issues raised in the First Motion.[56] The revised privilege logs were then reviewed by the undersigned. The logs are sufficient, as the names of the documents, descriptions, elements of the privilege, dates, authors, and recipients are identified. However, because the privilege log descriptions indicate that the documents were prepared for

---

[52] R. Doc. 130, pp. 1-2, *citing Veith v. Portage County, Ohio*, No. 11-2512, 2012 WL 4850197 (N.D. Ohio Oct. 11, 2012) (all other citations omitted).
[53] R. Doc. 130, pp. 4-5.
[54] R. Doc. 123, pp. 2-3 and R. Doc. 141, p. 2.
[55] *See* R. Doc. 133. As to Plaintiff's argument that CorrectHealth waived any claim of privilege by failing to timely produce an adequate privilege log, the Court already concluded that the preferred method of resolving the issue was to permit CorrectHealth an opportunity to provide an amended log. *Id.*, p. 5 *citing Cashman Equipment Corp. v. Rozel Operating Co.*, No. 08-363, 2009 WL 2487984, at *2 (M.D. La. Aug. 11, 2009).
[56] R. Doc. 140 *and see* the logs at R. Doc. 140-1, pp. 2-3.

multiple purposes, on March 19, 2020, CorrectHealth was ordered to file the mortality review and the psychological autopsy into the record under seal for *in camera* review to determine whether all or part of the information contained in the documents is privileged.[57]

### 5. The Autopsy Documents Are Subject to Production With Redactions

The psychological autopsy report and the mortality review documents prepared with regard to Fano were specifically requested by Plaintiff in this matter and are plainly relevant to Plaintiff's claims in this case that the defendants failed to protect Fano from harm and were deliberately indifferent to his medical needs which resulted in his death by suicide.[58] These documents will not be burdensome to produce, as they consist of a total of nine pages.[59] The only issue with respect to production of these documents is whether any part of them is protected by either the peer-review/"self-critical analysis" or attorney client privileges.

#### a. Federal Common Law Does Not Recognize Self-Critical Analysis/Peer Review Privilege

Although Plaintiff has asserted a few state law claims, this matter primarily involves federal claims under 42 U.S.C. § 1983, such that the federal common law applies. The federal common law does not recognize a self-critical analysis/peer-review privilege,[60] as aptly explained in *Belcher*:

---

[57] R. Doc. 179.
[58] R. Doc. 23, introductory paragraph (First Amended Complaint).
[59] R. Doc. 140-1, pp. 2-3.
[60] The Fifth Circuit has not provided explicit guidance on the "self-critical analysis" privilege. Rather, the Fifth Circuit has declined to expressly recognize the privilege and has rejected its applicability in some cases. *See, e.g., In re Kaiser Aluminum & Chem. Co.,* 214 F.3d 586, 593 (5th Cir. 2000) (rejecting self-critical analysis privilege asserted in response to U.S. government agency subpoenas seeking pre-accident reports) ("As for the self-evaluation privilege, Fed.R.Evid. 501 states that privileges 'shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.' Privileges 'are not lightly created nor expansively construed, for they are in derogation of the search for truth.' *United States v. Nixon*. The Fifth Circuit has not recognized the self-evaluation privilege, and 'courts with apparent uniformity have refused its application where, as here, the documents in question have been sought by a governmental agency.'")(internal footnotes omitted). As such, all of the non-controlling out-of-circuit federal authority relied upon by CorrectHealth regarding this privilege is unpersuasive. *See* R. Doc. 127, pp. 4-8, citing *Weekoty v U.S.*, 30 F.Supp. 2d 1343 (D.N.M. Nov. 13, 1998) (other citations omitted). The only in-circuit cases cited by CorrectHealth, *United States v. Harris Methodist Fort Worth*,

11

> The magistrate overruled CorrectHealth's peer-review privilege objection. First, the Magistrate noted that "this is a federal question case brought under Section 1983 with a single pendent state law claim."[61] Then, citing several Louisiana district court cases, the Magistrate noted that in cases where purportedly privileged information relates to the federal law claim— such as this one—the "federal law of privilege governs all claims of privilege asserted in the litigation."[62] The Magistrate then noted that there is no peer-review privilege under federal common law or federal statutory law, and that as a result, the Louisiana peer-review privilege statute does not apply in the case.[63]

In refusing to recognize the peer-review privilege, the *Belcher* court also rejected CorrectHealth's arguments re: the applicability of *Jaffe*.

> On appeal, CorrectHealth argues that the Magistrate should have applied three factors from *Jaffee* [sic] *v. Redmond* to determine whether a 'peer review privilege exists.' *Jaffe* is a United States Supreme Court case which formally recognized a new type of privilege—the psychotherapist privilege—under Federal Rule of Evidence 501. CorrectHealth therefore appears to argue that it was clearly erroneous for the Magistrate to refrain from engaging in this three-factor test. The Court disagrees. The three-factor test cited by CorrectHealth is used to determine if a federal court can properly define new federal privileges under Federal Rule of Evidence 501 if one does not already exist.

---

970 F.2d 94 (5th Cir. 1992) and *Cuccia v. Hillhaven*, No. 92-4256, 1994 WL 236329 (E.D. La. May 20, 1994) are distinguishable. *Harris Methodist Fort Worth* involved a compliance review by the Department of Health Hospitals ("DHH") of the defendant hospital's records regarding its physicians' staff privileges and peer-review processes. DHH requested a large volume of information regarding the granting of staff privileges by the hospital, including peer-review records. The hospital objected to the breadth of the search. With regard to the balancing of the reasonableness of the search in the context of the facts of the case before it, which are distinctly different from the facts here, the Fifth Circuit recognized 42 U.S.C. § 11101(5) as a Congressional finding of a national need for confidentiality of physicians engaging in peer-review of their colleagues. *Id.* at 101. *Cuccia* was a diversity case involving state law claims. In *Cuccia*, the short ruling reflects that the production was not to include peer-review or quality assurance documents if the producing party contended that La. R.S. 13:3715.3 applied, in which case the producing party was ordered to submit a privilege log. Here, the federal common law of privilege applies to this federal question case.

[61] 2019 WL 5860744, *6, *citing* R. Doc. 78, p. 7.

[62] 2019 WL 5860744, *6, *citing* R. Doc. 78, p. 7 (*citing Rdzanek v. Hosp. Serv. Dist. No. 3*, No. 03-2585, 2003 WL 22466232 (E.D. La. Oct. 29, 2003) ("Courts turn to federal law regarding privileges in federal question cases, but look to state law privileges when state law provides the rule of decision for the plaintiff's claims . . . . Courts addressing the issue have held that when the allegedly privileged information relates to the federal law claim, federal law of privilege governs all claims of privilege raised in the litigation."); *Vezina v. United States*, No. 07-0904, 2008 WL 11395516 (W.D. La. June 3, 2008); *Robertson v. Neuromedical Ctr.*, 169 F.R.D 80 (M.D. La. 1996) (declining to recognize a peer-review privilege in case with federal law and state law claims because "[t]his is not a case where the substantive law is only nominally federal law by reference. There has been no showing by the hospitals that state law issues predominate over federal issues.")).

[63] 2019 WL 5860744, *6, *citing* R. Doc. 78, pp. 7-8 (*citing Rdzanek*, 2003 WL 22466232, at *3).

12

> Magistrate Judge Wilkinson correctly established that the federal law on privileges, not state law, applies in this case. CorrectHealth has failed to demonstrate the existence of a peer-review privilege at the federal common law. In the absence of a recognized peer-review privilege in the federal common law, this Court declines CorrectHealth's invitation to adopt it as a new one.[64]

The undersigned finds the analysis of *Belcher* persuasive and rejects CorrectHealth's arguments[65] in support of the applicability of Louisiana peer-review privilege in this federal question case for the same reasons.

### b. Though the Information in the Autopsy Documents is Generally Not Privileged, Some Information Appears Primarily Related to Legal Advice

CorrectHealth asks this Court to disregard the portion of Llovet's testimony that the autopsy documents are created pursuant to CorrectHealth's policies in the ordinary course of business, regardless of the threat of litigation or whether legal advice is sought. CorrectHealth argues that Llovet's testimony is irrelevant because she is employed by a different CorrectHealth entity. While Llovet may not be CorrectHealth's direct employee, she is an employee of a related CorrectHealth entity whose policies contain similar provisions to those at issue, and her testimony is relevant.[66] Regardless, the plain language of CorrectHealth's written policies reflect that the main purpose for preparing the autopsy documents is quality control and evaluation of the care provided.[67] Additionally, while the Inmate Death Policy requires notification to the Chief Legal

---

[64] *Id.* (internal citations omitted).
[65] This includes the pronouncements of other courts and other state legislatures. *See* R. Doc. 127, p. 3, *citing George v. Christus Health Sw. Louisiana*, 2016-42, 203 So.3d 541 (La. App. 3 Cir. 10/12/16)) and R. Doc. 127, pp. 5-6.
[66] *See* R. Doc. 118-11, p. 7; R. Doc. 127, p. 9 (opposition memorandum, noting Llovet is a corporate representative of CorrectHealth Jefferson); R. Doc. 130-3, p. 6 (CorrectHealth Jefferson Suicide Prevention Policy); and R. Doc. 130-4, pp. 5-7 (CorrectHealth Jefferson Inmate Death Policy).
[67] *See* R. Doc. 118-5, p. 2 (Inmate Death Policy) ("All inmate deaths will be reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures or practices are warranted; and to identify issues that require further study.").

Officer, upon the occurrence of an inmate death,⁶⁸ the policy contemplates a multidisciplinary review and does not specifically state that participation by CorrecHealth's Chief Legal Officer is for purposes of obtaining legal advice. However, there is testimony in the record to suggest that an additional purpose of the mortality review is to obtain legal advice from counsel.⁶⁹ While the mere presence of legal counsel at meetings or copied on the documents does not automatically render the autopsy documents privileged,⁷⁰ after *in camera* review, although they consist primarily of underlying facts, medical information, and a timeline of events, which are not protected from disclosure, there is very limited information in the autopsy documents that appears to be primarily legal advice or information transmitted to counsel for the purpose of obtaining legal advice.⁷¹

While CorrectHealth has failed to meet its burden of establishing that a privilege applies to completely preclude production of the autopsy documents,⁷² the portions of the autopsy documents reflecting legal opinion or information provided for purposes of obtaining legal advice will be redacted.⁷³ Accordingly, the First Motion to Compel will be granted in part, subject to the

---

⁶⁸ R. Doc. 118-5, p. 2.

⁶⁹ *See* R. Doc. 127-1, p. 4 (deposition testimony of Dr. Carlo Musso) ("[W]e turn some of the legal questions and ask our lawyer, you know, our general counsel, you know, legal questions during this process"). Dr. Musso does also testify that the focus of the mortality review is to enable better healthcare. *See, e.g.*, R. Doc. 127-1, pp. 2-4 and R. Doc. 147-3, pp. 112-14 regarding the mortality review as reviewing and critiquing the care for the deceased inmate, that "as part of CQI, quality assurance, in general," CorrectHealth looks at the nursing and provider care to discuss it and critique it, and CorrectHealth obtains various opinions from other medical providers to examine the appropriateness of care. While counsel may conduct the "effort" and some "legal questions" are posed to counsel, Dr. Musso testified that all the information is directed to "hopefully" improve the health care that is provided.

⁷⁰ *BDO*, 2017 WL 5494237 at *3 (*citing Robinson*, 121 F.3d at 974). *See also Swoboda,* 2016 WL 2930962, at *5, n. 41 (recognizing that not all communications between an attorney and his client are privileged, "'[f]or example, no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer.'") (*citing In re Allen*, 106 F.3d 582, 602 (4th Cir. 1997)).

⁷¹ The instant Ruling departs from *Belcher*, which ordered production of the psychological autopsies *in toto*. However, the *Belcher* ruling did not reference issues with respect to privilege logs nor is there an indication that the court conducted an *in camera* review. Rather, the *Belcher* ruling indicates the analysis was based on CorrectHealth's written policy and the deposition testimony of Llovet and Jennings. No. 18-7368 (E.D. La. Sept. 16, 2019) at R. Doc. 78, p. 6.

⁷² *BDO,* 2017 WL 5494237 at *9 (5th Cir. 2017) (The party claiming the privilege bears the burden of proof.)

⁷³ *WII Uptown, LLC*, 2016 WL 4620200, at *9 (recognizing that "the attorney client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice,") *citing King v. University Healthcare Sys., Inc*., 645 F.3d 713, 720 (5th Cir. 2011)(*quoting Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720 (5th Cir. 1985).

following redactions, and the parties' agreed-upon protective order previously entered by the Court:[74]

*R. Doc. 181-1:*

The sentences in the numbered list at page R. Doc. 181-1, p. 6 shall be redacted prior to production, as follows: the first sentence of No. 5; the entirety of No. 6; and the last-listed item (also denoted No. 1), including the underlined heading above the last-listed item on p. 6.

*R. Doc. 182-1:*

The following information shall be redacted prior to production of R. Doc. 182-1: the last bolded heading on page 4 and the entire paragraph beneath that heading; and all the information on page 5.

### C. Third and Fourth Motions to Compel - Autopsy Documents and ESI as to Other Detainee

In the Third Motion to Compel,[75] Plaintiff seeks the mortality reviews and/or psychological autopsies prepared by CorrectHealth in connection with the deaths of fifteen identified EBRPP inmates since CorrectHealth has been responsible for health care at EBRPP (January 1, 2017);[76] specifically: "any documents related to any administrative review, mortality or morbidity investigation or review, psychological autopsy, or similar," *i.e.*, any document that reviews the reasons for, circumstance of, and events leading up to these deaths.[77] Plaintiff propounded the discovery request seeking this information on September 18, 2019. CorrectHealth timely responded on October 18, 2019.[78]

---

[74] R. Doc. 171. The autopsy documents contain a significant amount of Fano's medical information.
[75] R. Doc. 135.
[76] R. Doc. 23, ¶ 10.
[77] R. Doc. 135-1, pp. 3-4 and R. Doc. 135-6, p. 12.
[78] R. Doc. 135-1, pp. 3-4; R. Doc. 135-2, p. 1; R. Doc. 135-6, pp. 11-12; R. Doc. 135-7, p. 3.

15

Plaintiff's Fourth Motion to Compel[79] seeks production of ESI related to inmate suicide deaths at other CorrectHealth facilities in the three-year period that pre-dated Fano's death,[80] either by a date certain or on a rolling basis.[81]  Plaintiff contends she informally requested this information via emails to defense counsel throughout the spring and fall of 2019,[82] or alternatively, in her First Set of Discovery Requests in January 9, 2019.[83]  The Fourth Motion to Compel attaches email correspondence between counsel for CorrectHealth and counsel for Plaintiff.  In that email chain, the latest of which was sent in late October 2019, CorrectHealth advises Plaintiff that CorrectHealth does not believe the requests have been made to date and that it is maintaining "objections as discussed (attorney-client, peer review, self-critical analysis, subsequent remedial measures, overly broad and burdensome, irrelevant, and not reasonably calculated to least to discovery of admissible evidence)."[84]  Upon clarification by Plaintiff's counsel that Plaintiff is "requesting ESI on suicides involving any facility managed by Correct Health [sic] for the three years prior," CorrectHealth's counsel responds that it is only producing information related to CorrectHealth, not any affiliates.[85]

---

[79] Per the Fourth Motion, (which for the most part unhelpfully reproduces the contents of email discussions among counsel that were attached), the parties engaged in several rounds of communications regarding Plaintiff's ESI requests, including search terms for the requests, the types of ESI requested and how they could be produced (*e.g.*, native format), and whether information would be redacted or produced pursuant to a protective order, *etc*.  However, the Fourth Motion is deficient because Plaintiff failed to propound a discovery request(s) for the ESI sought. Plaintiff's informal request via email is not compliant with Fed. R. Civ. P. 34 and is not a properly served request for production.
[80] The ESI sought via the Fourth Motion is not entirely clear, but the parties' correspondence discusses this particular ESI.  R. Doc. 136-6, pp. 3-4.
[81] R. Doc. 136-2, pp. 1, 5-6 (citations omitted).
[82] R. Doc. 136-1; R. Doc. 136-2, pp. 2-5; *and see* R. Doc. 136-3 through R. Doc. 136-6.
[83] R. Doc. 152, p. 6; R. Doc. 152-2. Plaintiff did not attach CorrectHealth's Responses to Plaintiff's First Set of Discovery to the Fourth Motion; however, the Responses are in the record at R. Doc. 118-4 and were served on March 11, 2019.  Plaintiff has not argued that these Responses were served untimely.
[84] R. Doc. 136-6, p. 3.
[85] *Id*., p. 4.

CorrectHealth's responses to the requests that are the basis of the Third Motion to Compel were provided October 18, 2019.[86] Additionally, it was clear by late October 2019 that CorrectHealth did not believe the information in the Fourth Motion to Compel had been requested and that CorrectHealth did not intend to respond to Plaintiff's requests for ESI related to suicides at other CorrectHealth facilities. The Third and Fourth Motions were not filed until November 8, 2019--after the November 1, 2019 deadline to complete fact discovery and to file discovery motions.[87] Therefore, both Motions are untimely. No party addresses the timeliness of the Third or Fourth Motions to Compel, however, to the extent Plaintiff would rely on Local Civil Rule 26(d)(1) to argue that these Motions were filed within seven days after the discovery deadline, Plaintiff has not established that the Motions "pertain to conduct occurring during the final seven days of discovery."[88] Plaintiff received CorrectHealth's written responses to the information sought in the Third Motion on October 18, 2019 and counsel's final discussion regarding those responses was on October 28, 2019. As to the Fourth Motion, the email correspondence exchanged between counsel in late October establishes that Plaintiff was on notice CorrectHealth did not intend to respond to Plaintiff's informal requests for the ESI. These discussions in late October regarding the discovery disputes do not amount to "conduct occurring during the final seven days of discovery" as contemplated in Local Rule 26(d)(1).[89]

---

[86] Plaintiff's counsel confirms that CorrectHealth's objections to the discovery requests that are the subject of the Third Motion to Compel were discussed on October 28, 2019. R. Doc. 135-2, ¶ 5.

[87] R. Doc. 115. Plaintiff's memorandum in support of her Fourth Motion incorrectly states: "Plaintiff files the instant motion on the deadline for filing motions to compel." R. Doc. p. 136-2, p. 1.

[88] Local Civil Rule 26(d)(1).

[89] The Motions do not relate to, for example, receipt of discovery responses or subpoenas, or depositions taken within the final seven days of the discovery period. *See, e.g., McMillan v. J.P. Morgan Chase Bank, N.A.,* No. 15-500, 2017 WL 373447, at *1 (M.D. La. Jan. 25, 2017) (holding that a motion to quash filed the seventh day after the close of discovery was timely filed pursuant to Local Rule 26 because it sought to quash subpoenas duces tecum served by the plaintiff on the day of the fact discovery deadline).

17

Plaintiff has provided no explanation for the untimely filing of the Third and Fourth Motions to Compel, nor made a showing of "exceptional circumstances" so as to avoid application of the Local Rule. Rather, Plaintiff was aware of the disputes regarding the requests at issue in sufficient time to file the Motions before the November 1, 2019 deadline or to seek an additional extension of the discovery deadlines, as the parties had done at least twice before.[90] Accordingly, the Third Motion to Compel and the Fourth Motion to Compel will be denied as untimely.[91]

### III. Conclusion

Accordingly,

**IT IS ORDERED** that the First Motion to Compel Against Defendant CorrectHealth East Baton Rouge, LLC,[92] filed by Plaintiff Maria Zavala, is **GRANTED IN PART**. The mortality review and the psychological autopsy relating to the death of Louis Fano must be produced to Plaintiff by no later than **May 28, 2020**, subject to the following redactions, and the parties' agreed-upon protective order previously entered by the Court:[93]

> *R. Doc. 181-1:*
>
> The sentences in the numbered list at page R. Doc. 181-1, p. 6 shall be redacted prior to production, as follows: the first sentence of No. 5; the

---

[90] R. Doc. 109, R. Doc. 115.
[91] *See, e.g., Bryant v. State Farm Mut. Auto. Ins. Co.,* No. 17-315, 2018 WL 3869981, at *1 (M.D. La. Aug. 14, 2018) (denying untimely filed motion to compel an independent medical examination and holding: "Having found no exceptional circumstances to order an untimely Rule 35 examination based on the assertions in the instant motion, the Court will deny the instant motion as untimely. *See* LR 26(d)(1); *see also Price v. Maryland Cas. Co.*, 561 F.2d 609, 611 (5th Cir. 1977) (denying motion to compel filed after the close of discovery where party had been 'inexcusably dilatory in his efforts'); *Days Inn Worldwide, Inc. v. Sonia Investments*, 237 F.R.D. 395, 396-99 (N.D. Tex. 2006) (motion to compel was untimely filed two weeks after the discovery deadline; motion should have been filed within discovery deadline); *Wells v. Sears Roebuck and Co.*, 203 F.R.D. 240, 241 (S.D. Miss. 2001) ("[I]f the conduct of a respondent to discovery necessitates a motion to compel, the requester of the discovery must protect himself by timely proceeding with the motion to compel. If he fails to do so, he acts at his own peril.").
[92] R. Doc. 118.
[93] R. Doc. 171.

entirety of No. 6; and the last-listed item (also denoted No. 1), including the underlined heading above the last-listed item on p. 6.

*R. Doc. 182-1:*

The following information shall be redacted prior to production of R. Doc. 182-1: the last bolded heading on page 4 and the entire paragraph beneath that heading; and all the information on page 5.

**IT IS FURTHER ORDERED** that the Third Motion to Compel against Defendant CorrectHealth East Baton Rouge, LLC,[94] filed by Plaintiff Maria Zavala, is **DENIED** as untimely.

**IT IS FURTHER ORDERED** that the Fourth Motion to Compel against Defendant CorrectHealth East Baton Rouge, LLC,[95] filed by Plaintiff Maria Zavala is **DENIED** as untimely.

Signed in Baton Rouge, Louisiana, on May 21, 2020.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[94] R. Doc. 135.
[95] R. Doc. 136.